# United States Court of Appeals
## For the First Circuit

No. 11-1437

JAMES M. SCHATZ,

Plaintiff, Appellant,

v.

REPUBLICAN STATE LEADERSHIP COMMITTEE; REPUBLICAN STATE
LEADERSHIP COMMITTEE-MAINE PAC; CROSSROADS MEDIA LLC; PATTI HECK;
MICHAEL DUBKE; SCOTT S. WARD; BEN CANNATTI; ARENA COMMUNICATIONS
LLC; OHMAN HOLDINGS LLC; VALCARCE HOLDINGS LLC; ARENA HOLDINGS
INC.; THE GRASSY KNOLL LLC; RICHARD J. OHMAN; PETER J. VALCARCE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. D. Brock Hornby, U.S. District Judge]

Before
Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Barry K. Mills, with whom Hale & Hamlin, LLC was on brief, for
appellant.
Timothy F. Brown, with whom Arent Fox LLP, Paul W. Chaiken,
and Rudman & Winchell were on brief, for appellees Republican State
Leadership Committee, Republican State Leadership Committee-Maine
PAC, Scott S. Ward, and Ben Cannatti.
Andrew M. Friedman, with whom Patton Boggs LLP, Anne Birgel
Cunningham, Alexia Pappas, and Verrill Dana, LLP were on brief, for
appellees Crossroads Media LLC, Patti Heck, Michael Dubke, Arena
Communications LLC, Valcarce Holdings LLC, Arena Holdings Inc., The
Grassy Knoll LLC, Richard J. Ohman, and Peter J. Valcarce.

February 10, 2012

**THOMPSON**, <u>Circuit Judge</u>.

**PROLOGUE**

Campaigning for public office sometimes has the feel of a contact sport, with candidates, political organizations, and others trading rhetorical jabs and sound-bite attacks in hopes of landing a knockout blow at the polls. It is not for the thin-skinned or the faint-hearted, to use two apropos clichés. <u>See</u> <u>Monitor Patriot Co.</u> v. <u>Roy</u>, 401 U.S. 265, 275-76 (1971). And because political speech is the life-breath of democracy, <u>see</u> <u>Eu</u> v. <u>S.F. Cnty. Democratic Cent. Comm.</u>, 489 U.S. 214, 223 (1989), the First Amendment – applied to the states via the Fourteenth – bars public figures from recovering damages under state defamation laws unless they show that the defamer acted with "actual malice," <u>see</u> <u>New York Times Co.</u> v. <u>Sullivan</u>, 376 U.S. 254, 279-80 (1964), legalese that might suggest ill will or evil motive to the uninitiated but really means knowledge of falsity or reckless disregard for the truth, <u>see</u> <u>Masson</u> v. <u>New Yorker Magazine, Inc.</u>, 501 U.S. 496, 509-11 (1991).[1] Cases define "reckless disregard" variously as a defamer's having "'serious doubts'" about a statement's falsity, or "actually" having "a 'high degree of awareness of . . . probable falsity,'" or suspecting falsity and purposefully – not just negligently – avoiding the truth. <u>Harte-</u>

---

[1] For a succinct summary of the history behind what is sometimes called the "<u>New York Times</u> rule," see <u>Lluberes</u> v. <u>Uncommon Prods., LLC</u>, 663 F.3d 6, 11-14 (1st Cir. 2011).

Hanks Commc'n, Inc. v. Connaughton, 491 U.S. 657, 688, 692 (1989) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968), and Garrison v. Louisiana, 379 U.S. 64, 74 (1964), respectively).

All this makes it quite obvious that defamation law does not require that combatants for public office act like war-time neutrals, treating everyone evenhandedly and always taking the high road. Quite the contrary. Provided that they do not act with actual malice, they can badmouth their opponents, hammering them with unfair and one-sided attacks – remember, speaking out on political issues, especially criticizing public officials and hopefuls for public office, is a core freedom protected by the First Amendment and probably presents "the strongest case" for applying "the New York Times rule." See id. at 666 n.7, 686-87. And absent actual malice, more speech, not damages, is the right strike-back against superheated or false rhetoric. See id. at 686-87.

Today's appeal – targeting speech critical of a candidate's performance in public office and challenging the dismissal of his defamation-based complaint for failure to state a claim – brings these principles into bold relief. Finding no reversible error in the judge's careful opinion, we affirm. The story follows.

**HOW IT ALL BEGAN**

Having lost his bid for a Maine Senate seat in 2010, Democratic politician James Schatz brought this diversity suit (governed, all agree, by Maine law) against a slew of defendants for defamation libel, intentional infliction of emotional distress, and publicly placing him in a false light.  Our case caption lists the complete cast of defendants.  For simplicity's sake, we follow the parties' lead and refer to the defendants, collectively, as the "RSLC," which is short for the Republican State Leadership Committee.

The gist of Schatz's operative complaint was that the RSLC opposed his candidacy and supported his opponent's with flyers, brochures, and radio and TV ads days before the election that conjured up imaginary wrongs that he had supposedly done as a selectman for the town of Blue Hill.  He attached copies of the offending circulars to his complaint, and we quote from one of them, which is representative of the others.[2]  Emblazoned on the front are these words:

> No Rockets' Red Glare,
> No Bursting in Air.
> Thanks to JIM SCHATZ . . .

---

[2] The judge reproduced the flyer as Exhibit A to his decision. See Schatz v. Republican State Leadership Comm., 777 F. Supp. 2d 181, 192 (D. Me. 2011).  To save trees, we refer the interested reader there rather than reproducing a copy here. As for the radio and TV ads, they basically parroted what the flyers said, Schatz alleged.

(Emphases removed.)  And on the back:

> Jim Schatz voted to cancel the $10,000 fireworks celebration for the Fourth of July – blaming it on a bad economy.
>
> However, before canceling the show, Schatz and the Blue Hill Selectmen gave 10,000 taxpayer dollars to a political organization.
>
> It's wrong for Schatz to give your money to a political organization, and it was wrong for Schatz to cancel your 4th of July celebration.
>
> On November 2, Vote against Jim Schatz, because he's wrong for Maine.

(Emphases removed.)

A fine-print footnote in the flyers references two newspaper articles as the source for these assertions, and Schatz appended both items to his complaint too.  The first, from the July 2, 2009 edition of the <u>Bangor Daily News</u>, chronicled the financial difficulties confronting cash-strapped Maine towns in funding fireworks for the 2009 Independence Day celebration:

> There will be no fireworks display in Blue Hill this Fourth of July due to the poor economic climate, but business is booming elsewhere as municipalities and private groups have worked hard to raise funds to pay for the fire that lights up the nation's birthday.

It continued:

> For the past two years the Hancock County town has fronted the money for the fireworks display for the Fourth to Remember celebration and paid the funds back through donations. There's about $10,000 in the account, but the selectmen and the fireworks committee opted not to spend the funds this year.

-5-

And it noted:

> "Given the economy, we felt that in good conscience we couldn't do it this year," said Selectman Jim Schatz. "We thought that to spend that much money on something that will light things up for a few seconds and then is gone was not the thing to do. Unless we were sure we could pay the town back, we didn't want to pull the trigger on it this year."

The second piece, from the August 9, 2009 edition of the Kennebec Journal, highlighted how local communities "are being asked to help roll back school consolidation." It started off:

> Starved for cash, the advocates pressing for a repeal of Maine's school district consolidation law are taking their fundraising appeal to the towns directly affected by the sweeping state mandate.
>     The Maine Coalition to Save Schools, which had $140 on hand at the beginning of July, is seeking campaign contributions from municipalities that turned down district mergers or are unhappy with the consolidation arrangements their voters approved.

It added:

>     Blue Hill approved a $3,000 contribution to the effort in January 2008 and $2,000 more in July of last year. James Schatz, a Blue Hill selectman and a state representative, said the town recently paid $5,000 to the coalition as the last installment of a $10,000 commitment.
>     And Danforth and Deer Isle residents each approved taking $3,000 out of town coffers to boost the effort in January and October of last year, respectively.

After noting "Monmouth selectmen don't have the power to contribute town funds to a political cause," it informed:

-6-

While it's legal for municipalities' legislative bodies to dig into taxpayer funds to support political causes, the Maine Municipal Association, the lobbying arm for Maine cities and towns, advises against it.

"Expressing one's view is one thing," association spokesman Michael Starn said. "Expending town funds to support their view is much more problematic."

A municipality should generally take a position of "more fact gathering and factual dissemination, not advocacy as individual communities," Starn said.

But municipal officials, he noted, are free to express their opinions on pending political matters, and a town's legislative body can approve resolutions supporting or opposing particular causes.

"You do have a responsibility as a government official to approach this whole advocacy thing in a very responsible way," Starn said.

And, finally, it reported:

According to [Dick] Dyer, [a repeal advocate,] there's no reason that can't involve committing town funds to advancing a political cause.

Town officials "make decisions all the time that are political in nature that involve spending taxpayers' dollars," he said.

Schatz, the Blue Hill selectman, acknowledged that questions come up when municipalities contribute to political causes.

But "a lot of the rural, small schools have been hurt" by consolidation, he said. "If (one) were to examine the issue, it would seem appropriate" to contribute to the repeal campaign.

Getting back to the complaint, Schatz alleged that the RSLC had defamed him by falsely accusing him of a crime: having lobbed words like "wrong" and "misuse" while denouncing him for working both to give taxpayer money to a "political organization"

-7-

and to squelch the 2009 fireworks display, the RSLC had smeared him as a stealer of public funds. Eager to set things straight, Schatz declared in his complaint that town voters had decided in January 2008 to make an up-to $10,000 contribution to the repeal-the-school-consolidation-law effort, though they apparently gave the selectmen the discretion to decide how much (if any) of the $10,000 to spend. Consistent with that vote, the selectmen paid the Maine Coalition to Save Schools ("Coalition," for easy reading) $10,000 in three installments of varying amounts, Schatz said, with the final payment coming the day before the 2009 Independence-Day festivities. Speaking of Independence Day 2009, Schatz alleged that he himself had voted in March 2009 to fund fireworks for that day but was outvoted by the town's other two selectmen. He also said that these funding decisions – the first, by the voters in January 2008 to kick into the repeal kitty; the second, by the selectmen in March 2009 not to spring for fireworks, after he lost 2-1 on that issue – were totally unrelated.

Schatz then used the words "actual malice" in his complaint, claiming that the RSLC knew based on the two articles that its defamatory statements were false or was recklessly indifferent to whether they were false. And, on top of that, he accused the RSLC of not bothering to confirm the truth of its assertions, faulting it for not doing anything to double-check the articles' accuracy.

**HOW THE CASE GOT HERE**

The RSLC promptly moved to dismiss Schatz's complaint for failure to state a viable claim. See Fed. R. Civ. P. 12(b)(6). Faced with that filing, Schatz dropped his intentional-infliction-of-emotional-distress claim and stated at a motion hearing that if his defamation claim failed so too would his false-light claim. Also importantly, Schatz agreed that the Coalition is a political organization, conceded that he was a public official for defamation purposes, and argued that the judge could identify actual malice by comparing what the newspapers said against what the flyers said.

After argument, the judge wrote a thoughtful opinion granting the RSLC's motion. Even assuming that the RSLC's statements were false and smacked of "'gotcha' politics" of a "juvenile" sort, the judge still had "serious doubts" about whether they were defamatory under Maine law – doubts that he did not resolve because he concluded that Schatz's complaint did not plausibly allege that the RSLC had acted with actual malice. See Schatz, 777 F. Supp. 2d at 187-91. Unpersuaded, Schatz appeals.

**OUR ANALYSIS**

We give de novo review to a Rule 12(b)(6) dismissal, using the same criteria as the district judge. See, e.g., Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7, 11-13 (1st Cir. 2011). Ocasio-Hernández points the way to the proper handling of a motion to dismiss. Step one: isolate and ignore statements in the

complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Id. at 12 (discussing, among other cases, Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief. Id. (again, discussing Iqbal and Twombly, among others); see also S.E.C. v. Tambone, 597 F.3d 436, 441-42 (1st Cir. 2010) (en banc). Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels us "to draw on" our "judicial experience and common sense." Iqbal, 129 S. Ct. at 1949, 1950. And in performing our review, we realize too that we can consider (a) "implications from documents" attached to or fairly "incorporated into the complaint,"[3] (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." Arturet-Vélez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005); see also Haley v. City of Boston, 657 F.3d 39, 44, 46 (1st Cir. 2011).

---

[3] Knowing that the documents may trump the complaint's allegations if a conflict exists, e.g., where a defendant has "excis[ed] an isolated statement from a document and import[ed] it into the complaint," see Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).

Like the district judge, we skip over whether Schatz's complaint plausibly alleges defamation and focus on whether it plausibly alleges actual malice – given that this is the simplest way to pinpoint Schatz's problem. Not so fast, Schatz says, suggesting that courts cannot take that tack. Unfortunately for Schatz, he cites no case for the point, and we are aware of none, so we need say no more about that. See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011). But before we tangle with the actual-malice issue, we need to clear away some underbrush.

Schatz intimates that the RSLC should get less First Amendment protection than traditional members of the institutional press. Again, though, he makes the point in passing, with no case analysis, which does not put the matter in play here. Id. He also faults the judge for dismissing his complaint without giving him the chance to fire up the pretrial-discovery process and at least get to the summary-judgment stage. But to access discovery mechanisms, a plaintiff must first produce a complaint that passes the plausibility test – a test that helps keep defendants from wasting time and money in discovery on "largely groundless" claims. See Twombly, 550 U.S. at 558 (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005)) (internal quotation marks omitted). And it does no good to suggest, as Schatz seemingly does, that a judge can cast aside complaints "just shy of a plausible entitlement to

-11-

relief" on summary judgment: because the high cost of litigation can scare defendants into settling even a weak case pre-summary judgment, a claim must have some degree of plausibility before the parties are put through their discovery paces. See id. at 558-59.

We turn our attention, then, back to whether Schatz's allegations plausibly support an actual-malice claim. His complaint used actual-malice buzzwords, contending that the RSLC had "knowledge" that its statements were "false" or had "serious doubts" about their truth and a "reckless disregard" for whether they were false. But these are merely legal conclusions, which must be backed by well-pled facts. See, e.g., Ocasio-Hernández, 640 F.3d at 12. As for facts, the complaint alleged that the RSLC had basically branded him a criminal, falsely charging him with working with his co-selectmen to "wrong[ly]" divert $10,000 in "taxpayer" funds to a "political organization" and then voting to kill a $10,000 fireworks celebration. The reality, at least according to his complaint, is that town residents had voted in January 2008 to contribute to the Coalition and that he had voted in March 2009 to fund the fireworks display. From these allegations Schatz further insists that the RSLC had portrayed him in a sinister light by connecting the two funding decisions (the one had nothing to do with the other) and by referring to the Coalition as a "political organization" rather than by its name (leaving the impression that maybe his "political organization" had

-12-

gotten the 10 grand).  Given what the newspapers had reported, which, according to the complaint, were the RSLC's sole sources of information, the RSLC knew the offending statements were false or made them recklessly without any regard for the truth – or so Schatz argues.  He also points out that his complaint alleged that the RSLC did not launch "any additional investigation" to determine whether what it said was true.  And, reaching the ultimate crescendo, he contends that the complaint's allegations plausibly show that the RSLC acted with actual malice.

We think just the opposite.  After comparing what the RSLC proclaimed with what the newspapers disclosed (as everyone agrees we should), we conclude that none of Schatz's points, individually or collectively, can save the day for him.

Let us start with Schatz's beef with the RSLC's labeling "wrong" a "vote" by him and his selectmen-partners to hand $10,000 to a "political organization":

1.  The Kennebec Journal story spotlighted how some consider funding like that to be inappropriate.  Yet it is all perfectly legal, the article pointed out.  Schatz himself essentially seconded these sentiments.  Yes, some people raise "questions" whenever a town contributes to a political cause, but "it would seem to be appropriate" to chip in town money to the repeal-the-school-consolidation-law campaign, he is quoted as saying.  And a commonsense reading of that article suggests that

-13-

words like inappropriate (and "wrong" surely is one) are not synonyms for criminal.

**2.** "Blue Hill approved" the contribution, the article added. But neither that tidbit nor anything else there identified Blue Hill <u>voters</u> as opposed to Blue Hill <u>officials</u> as the approvers. Also, Schatz concedes that he and his colleagues had voter-conferred discretion over whether to contribute any of the $10,000 in the first place, meaning that they did play a leading role in handing the Coalition $10,000. Undaunted, Schatz argues here that because the <u>Kennebec Journal</u> story said that residents in other towns had voted or needed to vote on the contribution question, one can infer that Blue Hill residents and not Blue Hill selectmen had to approve the appropriation too – given that (in the words of his brief) Maine residents "generally know" and Maine law generally provides "that selectmen can spend public funds only for purposes authorized by voters at a town meeting." This is a nonstarter, however: the article said nothing about whether these supposed appropriation rules apply uniformly across the state and, more importantly, to Blue Hill; also, at the risk of sounding like a broken record, even Schatz admits that he and his selectmen compatriots had the freedom to decide whether to contribute any money at all.

**3.** While we are talking about concessions, Schatz once again concedes that the Coalition is indeed a "political

-14-

organization."  And the inference that he asks us to draw – that "political organization" was code for a <u>Schatz</u> political organization that stood to reap the whole benefit from the $10,000 contribution – is simply too much of a stretch for us to credit, even at the pleading stage.  See <u>Gooley</u> v. <u>Mobil Oil Corp.</u>, 851 F.2d 513, 514, 515 (1st Cir. 1988) (explaining that while we must draw all reasonable inferences in the plaintiff's favor, we need not accept every imaginable inference).

As for his railing against the RSLC for saying he had voted not to fund the 2009 Fourth of July fireworks display and for tying the two spending decisions (contributing to the repeal campaign and cancelling the fireworks) together by their timing:

**1.**  The <u>Bangor Daily News</u> story reported that "the <u>selectmen</u> and the fireworks committee" had decided not to fund the fireworks show.  (Emphasis added.)  And it provided not even the slightest possible hint of a suggestion that Schatz had bucked his colleagues and voted yes on the fireworks-funding issue. Actually, his quoted comments – <u>e.g.</u>, that "we" could not "in good conscience" fund the fireworks "this year," given the poor economic climate, and that "[w]e thought" that spending $10,000 "on something that will light" up the sky "for a few seconds . . . was not the thing to do" – gave the distinct impression that he had voted no too.

-15-

**2.** Neither article tied the fireworks funding to the contribution payments. But the Kennebec Journal story of August 9, 2009 – published hard on the heels of the 2009 July Fourth celebration that had no fireworks – paraphrased Schatz as saying that Blue Hill had "recently paid" the Coalition "$5,000 . . . as the last installment of a $10,000 commitment." (Emphasis added.) Schatz harps on the judge's comment that the RSLC's juxtaposing the contribution payments with the fireworks cancellation suggests "careless[ness]" and smacks of childish "'gotcha' politics" too. Schatz, 777 F. Supp. 2d at 189, 191. But that does not help Schatz, because carelessness "is an indication of negligence, not actual malice." Levesque v. Doocy, 560 F.3d 82, 91 (1st Cir. 2009).

This spells doom for Schatz. By now it is plain that what the RSLC said synced up with or at least was not out of line with what the stories said. Most importantly for present purposes, none of Schatz's allegations – singly or together – plausibly suggest that, given the articles' reporting, the RSLC either knew that its statements were false or had serious doubts about their truth and dove recklessly ahead anyway. That his complaint also alleged that the RSLC passed on doing "additional" legwork to verify the truth behind its statements does not change things. True, "[r]ecklessness amounting to actual malice may be found" where the defendant "relies on a source" when "there is an obvious

reason to doubt its veracity . . . or deliberately ignores evidence that calls into question his published statements." Id. at 90. But Schatz has not alleged enough to meet that standard. The bottom line, then, is that he has not "nudged" his actual-malice claim "across the line from conceivable to plausible," so the judge rightly dismissed the complaint. See Twombly, 550 U.S. at 570.

As a last-ditch effort to save his case, Schatz suggests that if we do not reverse the judge we will be setting pleading standards higher than what Twombly and Iqbal require. Not so. Sure, malice is not a matter that requires particularity in pleading — like other states of mind, it "may be alleged generally." See Fed. R. Civ. P. 9(b). But, to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred – even in a world with Twombly and Iqbal. See, e.g., Iqbal, 129 S. Ct. at 1954 (noting that "Rule 9 merely excuses a party from pleading [states of mind] under an elevated pleading standard" – it does not give him carte blanche "to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss"). Having followed Twombly and Iqbal to a T, we easily reject Schatz's last line of attack.

## EPILOGUE

Concluding, as we do, that the judge reached a correct result, we uphold his decision and judgment.

**<u>Affirmed with costs to appellees</u>**.