# United States Court of Appeals
## For the First Circuit

No. 18-1119

ABINEL ZENON,

Plaintiff, Appellant,

v.

ASSOCIATE JUSTICE MARGARET GUZMAN,
in her official capacity,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Dana Goldblatt, with whom Law Office of Dana Goldblatt was on brief, for appellant.
Kerry D. Strayer, Assistant Attorney General, with whom Maura Healey, Attorney General was on brief, for appellee.

May 15, 2019

**THOMPSON**, **Circuit Judge**.  This federal case is brought by an aggrieved litigant who asks us to step in and change the way some things turned out for him in state court in Massachusetts. Specifically, appellant Abinel Zenon sought a declaratory judgment labelling as unconstitutional a protective order that remains in effect in his now-closed state criminal case.  This request was denied by the federal district court on appellee's motion to dismiss.  Because we hold that the state court judge's actions are shielded from this attack by the doctrine of judicial immunity, we affirm.

### BACKGROUND[1]

In 2013, Zenon was at the Springfield District Court for the Commonwealth of Massachusetts ("Springfield court"), attending to some driving charges unrelated to this case.[2]  While there, he wound up getting into an altercation with two court security officers who, according to Zenon, attacked him without provocation, all the while "making inappropriate comments to him regarding his ethnicity."  As Zenon tells it, one of the officers, Alexander Sierra, a former member of the Springfield Police

---

[1] As is required in reviewing a ruling on a Rule 12(b)(6) motion to dismiss, we rely on the factual account set forth in Zenon's amended complaint, unless otherwise noted.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (instructing us to "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true . . . .").

[2] We note the exact date of the incident is not in the record.

Department, already had a reputation around the courthouse for violence. When the scuffle ended, Zenon found himself charged and arraigned on two counts of assault and battery on the officers.

Based on Zenon's attorney's investigation of the incident, Zenon filed a notice of intent to assert the affirmative defense of self-defense. To get more information with which to bolster his case, Zenon subpoenaed administrative records from the Springfield court, seeking all written incident reports authored by Officer Sierra. In response to the subpoena, the records were filed with the court and delivered in due course to appellee Associate Justice Margaret Guzman ("Judge Guzman"), the judge overseeing Zenon's criminal case.

### Protective order

On July 29, 2015, Judge Guzman, following a chambers conference, turned over Officer Sierra's trial incident reports for the preceding two years, and ordered the Commonwealth to produce Springfield Police Department reports involving Officer Sierra for the same two-year period.[3] But she released the records to defense counsel with restrictions, making the documents subject to a part written/part oral protective order. The written ruling was encapsulated in a pre-printed order entitled "PROTECTIVE ORDER

---

[3] The records indicated that Officer Sierra reported using force against twenty-three individuals, and that an additional person had filed a complaint of excessive force against him with the police department.

FOR DEFENSE COUNSEL."[4]  The written order, amongst other things, permitted defense counsel to review the "presumptively privileged" records for purposes of preparing for trial, but prohibited her, without prior court approval, from disclosing any of the information to anyone, including Zenon or her investigator (but not including colleagues).  It also forbade her from contacting any of the individuals named in the reports without court permission.  From the bench, Judge Guzman likewise allowed the Commonwealth access to the records with similar restrictions.

As Zenon's criminal case proceeded, his counsel began to feel hampered by the prohibitions imposed by the court and repeatedly petitioned to have them lifted.  Prior to receiving the records, defense counsel, on her own, had investigated other alleged episodes involving Officer Sierra and had identified and contacted several participants and witnesses to discuss their own experiences with him.  Also, rumors abounded about other Officer Sierra dust-ups but the protective order thwarted counsel's efforts to dig deeper.  By September 2015, though, she had partial

---

[4] The authorized form for the protective order may be found just after the Reporter's Notes that follow the text of Rule 17 in Massachusetts' volume of court rules.  The form includes spaces for the docket number, the defendant's name, the judge and defense counsel's signatures, the date, and the defense counsel's address and bar number.  All other provisions, including the specific restrictions, are part of the pre-printed form.

success in convincing Judge Guzman to vacate the protective order as to at least two incidents,[5] but that was it.

On September 23, 2015, Zenon filed a petition for extraordinary relief with the Supreme Judicial Court of Massachusetts (the "SJC") to stay his criminal trial and vacate the protective order. This petition was denied without a hearing by a single justice, and Zenon pressed an appeal to the full court. A few days later, on October 5, 2015, Zenon entered a plea on the assault and battery charges: Zenon was not required to stipulate to the conduct alleged, and the charges were continued without a

---

[5] As described in Zenon's amended complaint, in one incident a pregnant African-American teenager was crying in the hallway outside the courtroom where her boyfriend was being detained. After she failed to compose herself on instructions from Officer Sierra, he threw her face down on the floor and placed his knee on her back, then pulled her upright and pushed her against the wall. He proceeded to hit her repeatedly in the face. Several hours later, the young woman miscarried her baby. She was later charged with assault and battery on Officer Sierra. This episode was confirmed by several bystanders, including an attorney.

The second incident also involved an African-American woman who had appeared before a judge on a child support matter. The judge instructed her to file some paperwork with the clerks' office; however, at the clerks' office she was told to return to the courtroom to get her file. She was intercepted at the courtroom door by a court security officer and told that she was trespassing. Officer Sierra followed her back to the clerks' office where she was explaining the situation to the clerk. Officer Sierra grabbed her, threw her to the ground, and handcuffed her. She too was charged with assault and battery on Officer Sierra.

finding of guilt.  But by its terms, the protective order remained in effect.[6]

Following the disposition of Zenon's criminal case, other individuals who had been charged with assault and battery under similar circumstances, as well as attorneys involved in other courthouse incidents, contacted Zenon's attorney seeking information about Officer Sierra.  Although Zenon had authorized his attorney to provide these people with relevant information, he and his attorney had been prevented by the protective order from sharing any information about Officer Sierra.

On February 4, 2016, a full panel of the SJC denied Zenon's request to further consider his petition to vacate the protective order.  Zenon v. Commonwealth, 44 N.E.3d 858, 859 (Mass. 2016).  Summarizing the prior proceedings, the court wrote: "[Zenon] sought certain third-party records in support of his claim that the alleged victim was in fact the first aggressor."  Id. at 859 (citing Commonwealth v. Adjutant, 824 N.E.2d 1 (Mass. 2005)). The court continued:  "The judge issued the protective order concerning these records, apparently following the Dwyer

---

[6] Paragraph Six of the protective order reads in part: "Notwithstanding the entry of any order terminating the case, this Protective Order shall remain in effect unless terminated by entry of a Court order."

protocol."  Id. (citing Commonwealth v. Dwyer, 859 N.E.2d 400,
414-19 (2006)).[7]

In explicating its decision, the SJC focused on the
procedure available to Zenon when he initially filed his motion
(that is, while the criminal charges were still pending).  The
court concluded that it did not need to exercise its "extraordinary
power of general superintendence under c. 211, §3" to intervene in
the workings of the Springfield court because Zenon had "an
adequate alternative remedy" in the normal trial and appellate
court processes.  Id. at 859-60 (citations and internal quotation
marks omitted).

> Had Zenon been tried and convicted of any offense, he
> could have challenged the protective order on direct
> appeal. . . .  If Zenon believes that the records have
> any continuing significance now that the charges have
> been resolved, he could move in the District Court for
> termination or modification of the protective order and,
> if such a motion is denied, appeal in the ordinary course
> from that ruling.

Id. at 859.

### *Federal litigation*

Opting not to follow any of the SJC's suggested pathways,
Zenon filed a complaint in federal court on July 14, 2016, seeking
a declaratory judgment that the protective order violates his First
Amendment rights, pursuant to 42 U.S.C. § 1983, and naming as
defendants Judge Guzman and the District Court Division of the

---

[7] We'll talk about the Dwyer protocol, announced by the SJC
in 2006, in our analysis section.

Massachusetts Trial Court.[8]  Judge Guzman responded with a Rule 12 motion to dismiss, making three principal arguments:  that she was protected from suit by sovereign immunity, pursuant to the Eleventh Amendment; that the federal court was barred from hearing the suit based on the doctrines of Younger and Rooker-Feldman abstention; and that the complaint was barred by collateral estoppel.  Zenon then amended his complaint, dropping the Commonwealth Trial Court as a defendant.  In due course a magistrate judge analyzed the amended complaint and Judge Guzman's motion, and recommended that Judge Guzman's motion be denied.  Thereafter, in a written objection to the report and recommendation, Judge Guzman took the opportunity to add a new argument to her motion: judicial immunity. In the end, after citing the confusion caused by Zenon's amendment to his complaint mid-motion practice, as well as "considerations of comity," the district judge permitted Judge Guzman's lately-added argument, and ruled that it carried the day, declining to adopt the report and recommendation and dismissing Zenon's claims.[9]

---

[8] And we are mindful that § 1983 does not mandate exhaustion of state court remedies.  See, e.g., Steffel v. Thompson, 415 U.S. 452, 472-73 (1974) ("When federal claims are premised on [§ 1983] -- as they are here -- we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights.").

[9] The court also concluded that both the Younger and Rooker-Feldman abstention doctrines, though an imperfect fit, posed a bar to relief, holding that they "cast a shadow over Plaintiff's case." Although Zenon challenges this finding on appeal, because we rest

## ANALYSIS

Zenon's appeal (as now distilled) brings the matter to our door for an examination of whether Judge Guzman is protected from this lawsuit by judicial immunity. First, some parameters for our review.

With respect to a motion to dismiss, we take as true the allegations of the complaint, as well as any inferences we can draw from it in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6). To assess the adequacy of the complaint, our circuit has instructed that the review should be handled like this: first, "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,]" then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio–Hernández v. Fortuño–Burset, 640 F.3d 1, 12 (1st Cir. 2011)) (discussing, among other cases, Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels

---

our ruling on the doctrine of judicial immunity, we leave abstention on the bookshelf for now.

us 'to draw on' our 'judicial experience and common sense.'" Schatz, 669 F.3d at 55 (quoting Iqbal, 556 U.S. at 679).

When analyzing a defense of judicial immunity, our review is much the same. "Affirmative defenses . . . may be raised in a motion to dismiss . . ., provided that the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" Santana-Castro v. Toledo-Davila, 579 F.3d 109, 113-14 (1st Cir. 2009) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 320 (1st Cir. 2008)) (alterations in original). And we are mindful that we may consider "not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice" without converting the motion to dismiss into a motion for summary judgment. In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). Ultimately, when the facts establishing the defense appear within the four corners of the complaint, and upon review there is "no doubt" that the plaintiff's claim is barred by the raised defense, dismissal is appropriate. Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 197 (1st Cir. 2001) (quotation marks omitted).

In undertaking this process, we have considered hearing transcripts from the Springfield court, attached as exhibits to the amended complaint. Schatz, 669 F.3d at 55-56 (noting that the court may consider, on a motion to dismiss, documents attached to or incorporated into the complaint).

Now, with the rules of play in place, we proceed to consider de novo whether, based on the facts pled, judicial immunity bars Zenon's claims. When all is said and done, we determine that Judge Guzman is entitled to immunity, as we explain.

### *A primer on judicial immunity*

The time-honored doctrine of judicial immunity was set forth long ago by the Supreme Court in Bradley v. Fisher, wherein the Court observed, complete with requisite references to England and the king, that judicial immunity "obtains in all countries where there is any wellordered system of jurisprudence." 80 U.S. (13 Wall.) 335, 347 (1871). Permitting judges to be questioned on their rulings, the Court said, would lead to "continual calumniations" and nothing short of the "subversion of all justice." Id. at 348 (internal quotation marks and citation omitted). The breadth of the protection is fulsome, shielding judges even when their actions are malicious, corrupt, mistaken, or taken in bad faith; its purpose not to buffer bad judges but "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." Pierson v. Ray, 386 U.S. 547, 554 (1967) (internal quotation marks and citation omitted). Therefore, it is an axiom of black letter law that when a judge carries out traditional adjudicatory functions, he or she has absolute immunity for those actions. Goldstein v. Galvin, 719

- 11 -

F.3d 16, 25 (1st Cir. 2013). And, the Supreme Court has recognized that judicial immunity applies in the context of suits -- like Zenon's -- that are brought under § 1983. Pierson, 386 U.S. at 554-55.

To determine if a judge is entitled to the full protection of the doctrine's deflector shield,[10] the Supreme Court has assessed whether the judge's act was one normally performed by a judge, and whether the parties were dealing with the judge in his or her judicial capacity. Stump v. Sparkman, 435 U.S. 349, 362 (1978). Judicial immunity is appropriate unless a judge is carrying out an activity that is not adjudicatory. Forrester v. White, 484 U.S. 219, 227-28 (1988) ("Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts."). The Forrester Court observed that "it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis." Id. at 229.

The Supreme Court elaborated further in Mireles v. Waco, explaining that immunity is overcome only in cases where a judge is carrying out a nonjudicial action, or in instances where a judge takes an action, though seemingly "judicial in nature," that is

_____

[10] And it's important to note: absolute judicial immunity means not just immunity from damages, but immunity from suit altogether. Mireles v. Waco, 502 U.S. 9, 11 (1991) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

- 12 -

"in the complete absence of all jurisdiction."  502 U.S. 9, 11-12

(1991) (per curiam) (citing Forrester, 484 U.S. at 227-29; Stump,

435 U.S. at 356-60; Bradley, 80 U.S. (13 Wall.) at 347).[11]

"Accordingly," the Mireles Court instructed, "as the language in

Stump indicates, the relevant inquiry is the 'nature' and

'function' of the act, not the act itself."  502 U.S. at 13 (quoting

Stump, 435 U.S. at 362).

In accordance with this analytic tradition, we look

closely at Judge Guzman's actions -- "the function performed" --

in issuing and maintaining the protective order.  In Zenon's eyes,

she was -- plain and simple -- a gatekeeping administrator for the

court's personnel records.  But as Judge Guzman sees things, she

was performing (in the words of the district court) "the bread-

and-butter adjudicatory function of a judicial officer" --

refereeing a discovery dispute.

### The battle of the procedural rules

The parties each attempt to justify their position by

drawing our attention to the state procedural rules they relied on

---

[11] In such circumstances, a state actor who happens to be a judge and who violates the Constitution while acting as an administrator might properly be subjected to suit under 42 U.S.C. § 1983.  In re Justices of Supreme Court, 695 F.2d 17, 21 (1st Cir. 1982).  But as then circuit-judge Stephen Breyer explained, "§ 1983 does not provide relief against judges acting purely in their adjudicative capacity, any more than, say, a typical state's libel law imposes liability on a postal carrier or telephone company for simply conveying a libelous message."  Id. at 22.

in connection with the contested state court rulings. Zenon, in his amended complaint, asserts that he made a request for administrative court records pursuant to Rule 2(2) of the Uniform Rules on Subpoenas to Court Officials, which, according to Zenon, governs public access to these records. Mass. Trial Court Rule IX(2)(2). This rule provides that an "official keeper of the records of the Trial Court shall provide an attested copy of court records or administrative records to a party who requests . . . such records . . . ." Mass. Trial Court Rule IX(2)(2). As he tells us, he sought internal records from the Trial Court's Executive Office; records generated pursuant to the administrative functioning of the court and completely unconnected to any criminal or civil proceeding before the court. Continuing on, he says that the production of this material could not properly be viewed as a discovery motion because the state's criminal procedural rule, Rule 14, only applies to material in "the possession, custody or control of the prosecutor, or persons under the prosecutor's direction and control . . . ." Mass. R. Crim. P. 14(a)(1)(A). And clearly, Zenon argues, the Massachusetts trial court records are not subject to the prosecutor's direction or control. Again, to put it simply, Zenon urges that in considering his request for court documents, Judge Guzman necessarily and exclusively had to have been exercising administrative authority over administrative records.

In response to Zenon's document request, Judge Guzman issued a pre-printed stock order which cites to Rule 17(a)(2) of the Massachusetts Rules of Criminal Procedure. This rule authorizes the clerk to issue a summons to a person "to produce the books, papers, documents, or other objects designated therein . . . within a reasonable time prior to the trial or prior to the time when they are to be offered in evidence . . . ." Mass. R. Crim. P. 17(a)(2). But notwithstanding the rule number referenced in the order, Judge Guzman explains in her brief that, contrary to Zenon's assertions, her protective order is best characterized as a garden-variety discovery order, issued in accordance with Rule 14, which governs pretrial discovery and procedures, including protective orders. Mass. R. Crim. P. 14(a)(6).

Ultimately, we conclude that whatever rule got referenced is not, at least in this instance, determinative of the question we must answer here: what is the essential character of Judge Guzman's actions in issuing the protective order?[12] Remember, as the Supreme Court instructed in <u>Stump</u> and <u>Mireles</u>,

---

[12] While the records themselves may be administrative, it is the judge's action of overseeing their production with which we are concerned. Mass. Trial Court Rule IX is described as a discovery rule by the Massachusetts Practice Series. 49 Mass. Prac., Discovery § 1:31. In this case, we refrain from opining as to whether requests to the trial court made pursuant to the Uniform Rules on Subpoenas to Court Officials may always be considered judicial in character, or may sometimes be classified as administrative.

- 15 -

"the relevant inquiry is the 'nature' and 'function' of the act . . . . In other words, we look to the particular act's relation to a general function normally performed by a judge . . . ." Mireles, 502 U.S. at 13 (quoting Stump, 435 U.S. at 362). Accordingly, we turn our attention to the record to better gauge Judge Guzman's actions.

### Zenon v. Guzman

We begin by taking judicial notice of the SJC's February 4, 2016 order resulting from Zenon's interlocutory appeal which we find relevant to our inquiry. Zenon, 44 N.E.3d 858. As stated earlier, the SJC mentioned two cases of import to our consideration: one, Adjutant established the standard to be followed by a trial judge in determining what evidence of a victim's prior aggressive behavior can be admitted at trial to bolster a defendant's claim of self-defense. 824 N.E.2d at 10-11. The other, Dwyer, refined the state's protocols for granting defendants pre-trial access to statutorily privileged third-party records of witnesses in criminal proceedings. 859 N.E.2d at 414. Pursuant to the protocol, "presumptively privileged records" are to be held by the court under seal, and reviewed only by defense counsel after counsel has entered into " a stringent protective order" containing "nondisclosure provisions." Id. at 418-19. Therefore, in explaining its decision to deny Zenon appellate relief, the SJC made clear that it understood Zenon's record

subpoena as a request for an _Adjutant_ hearing.  Equally as pellucid

is the SJC's understanding of Judge Guzman's in limine hearing as

a procedure in implementation of the _Dwyer_ protocols.  In

Massachusetts, both of these matters are routine pretrial

adjudicatory proceedings and generally subject to direct appellate

review.  See _Commonwealth_ v. _Chambers_, 989 N.E.2d 483, 493-94

(Mass. 2013) (ordering a new trial after trial court excluded

evidence of victim's prior act of violence); _Rodriguez_ v.

_Commonwealth_, 871 N.E.2d 486, 487 (Mass. 2007) (noting that post-

conviction relief is available for defendant who was unable to

obtain third party documents at trial).

How the SJC treats such hearings is, for us, strong

evidence of the nature and function of Judge Guzman's actions.

See _Veiga_ v. _McGee_, 26 F.3d 1206, 1210 (1st Cir. 1994) (noting

that the "Supreme Judicial Court, not this court, is the

authoritative interpreter of state statutes").[13]

### _Transcripts_

Further evidence of how best to characterize Judge

Guzman's actions lies in the transcripts from the proceedings

---

[13] Relatedly, in considering whether a judge's contested action "is a function normally performed by a judge," the _Stump_ Court made an examination of "the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." 435 U.S. 362.  The way that the SJC understands the procedural rules governing the parties dispute surely bears on the "expectations of the parties" for purposes of determining the nature and function of Judge Guzman's actions here.

below.[14] In her interactions with the parties, she specifically talks about Adjutant, repeatedly expressing her concern about the relevance and ultimate admissibility of the evidence that may be unearthed through defense counsel's inquiries into the Officer-Sierra incidents.

For instance, on July 29, 2015, Judge Guzman begins the on-the-record hearing by describing the session as a memorialization of "my first conference with both counsel," about issues discussed in chambers.  She continues:

> [T]he first thing I did was review the documents that were brought in by -- after the defendant's request for unredacted and full copies of the record potentially related to the Adjutant issues that were filed. . . . I reviewed those records and without my making a determination of whether or not there is any admissibility in what their use may be for I've determined that a copy of all the unredacted records will be provided to both counsel and both counsel will endorse a protective order. . . . [I]t was indicated to defense that she may review all of these records and at any time wishes -- if wishing to discuss this matter with an investigator or pursue inquiry through any of the information contained in the records that she will notify the Court through the clerk ex parte with a motion for good cause to either inform[] both parties of the contained information or to act on that information.

Tr., July 29, 2015.

---

[14] And to refresh the reader's recollection, the transcripts were attached to Zenon's amended complaint.

- 18 -

On September 14, 2015, Judge Guzman tells counsel that she wants to hear oral argument that morning concerning: "The question about the Adjutant material, not just the access issue but whether or not we are going to -- whether or not the request is to use any information, call any witnesses . . . ." Tr., Sept. 14, 2015. When both attorneys indicate that they are not prepared to go forward, Judge Guzman and defense counsel engage in a colloquy about whether there will be a "pre voir dire argument on that issue." Id. Judge Guzman goes on to express her concern about the admissibility of the evidence that defense counsel is trying to gather: "So there is [] really a very narrow area of admissibility that we are focused on, and the first is whether or not there is a valid defense claim that's been raised, and second, whether there is a question as to who is the first aggressor." Id.

Additionally, Judge Guzman addresses her obligation to balance the privacy rights of those members of the community who may be identified in the Officer-Sierra incident reports with Zenon's rights to prepare his defense to criminal charges. These concerns, she noted, encompassed Officer Sierra's interests in maintaining the confidentiality of his personnel and medical records. Tr., Aug. 26, 2015. Unmistakably then, Dwyer, though not expressly mentioned, animated Judge Guzman's thinking, and the

stock protective order she issued reflects <u>Dwyer</u>'s instructive directives.[15]

We believe the issues addressed by Judge Guzman go to the heart of a judge's role in regulating discovery and ruling on the admissibility of evidence in a criminal trial. <u>See</u> Fed. R.

---

[15] For example, on August 26, 2015, the parties convened, and Judge Guzman explained her work in the preceding weeks:

> There is very little case law in the area we are in, which is a public display of official capacity action and request to use records which are there is no grounds to believe that there is an official determination of first aggressor behavior by Officer Sierra. I have no information that anyone has []ever made a formal complaint against Officer Sierra alleging first aggressor behavior that would qualify the <u>Adjutant</u>.

Tr., Aug. 26, 2015. During the same hearing, Judge Guzman cautions Zenon's attorney about talking to other people, in connection with Officer-Sierra incidents, because those other people might be represented by counsel.

Later Judge Guzman addresses the protective order directly, allowing the order to be loosened to permit defense counsel to contact two people who had expressly waived confidentiality. Here she expresses broader concerns:

> Once the persons who are involved in the incidents make a determination that they don't wish to have the protection of the Court, the court is going to allow the motion to expand. In fact, the protective order will not be involved in those incidents. . . . The protective order remains as to the other incidents that -- where is no determination that the persons who are involved have agreed to waive any confidentiality of any protection of the courts. . . . And that is the fourth motion to modify the protective order, and I think that covers all the issues in that.

<u>Id.</u>

Crim. P. 12 and 16(d)(1); Mass. R. Crim. P. 17(a)(2); Nystedt v. Nigro, 700 F.3d 25, 30-31 (1st Cir. 2012); United States v. Cianci, 378 F.3d 71, 100-01 (1st Cir. 2004); Dwyer, 859 N.E.2d at 418; Adjutant, 824 N.E.2d at 12 (noting that trial judges are afforded great discretion "in weighing the probative value of evidence against any prejudicial effect it might have on a jury"). Although we have been supplied with over a hundred pages of transcripts, we need dig no further to conclude that Judge Guzman's concerns, and resulting rulings, were inarguably judicial in both their "nature" and their "function."[16] Mireles, 502 U.S. at 13 (quoting Stump, 435 U.S. at 362).

## CONCLUSION

For the reasons stated, we affirm the district court's decision. Each party to bear its own costs.

---

[16] Indeed, as we've already pointed out, in considering whether a judge's contested action "is a function normally performed by a judge," the Supreme Court in Stump looked at "the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." 435 U.S. 362. As we see it, the parties' expectations here, which Stump makes relevant, are evident. Zenon's attorney requested the records to aid in preparing Zenon's self-defense claim in the pending criminal case. The records were released, subject to a protective order, which was announced during the course of an adversarial hearing in the courtroom. Subsequent hearings were held, during which counsel argued that the scope of the protective order should be limited -- discussions in which the judge and counsel focused on the potential admissibility of evidence, pursuant to Massachusetts law. These circumstances demonstrate that counsel was dealing with the judge in her "bread-and-butter" judicial capacity.