# United States Court of Appeals
## For the First Circuit
#### For the First Circuit

No. 22-1710

ALICIA LOWE; JENNIFER BARBALIAS; GARTH BERENYI; DEBRA CHALMERS;
NICOLE GIROUX; ADAM JONES; NATALIE SALAVARRIA,

Plaintiffs, Appellants,

v.

JANET T. MILLS, in her official capacity as Governor of the
State of Maine; JEANNE M. LAMBREW, in her official capacity as
Commissioner of the Maine Department of Health and Human
Services; NANCY BEARDSLEY,* in her official capacity as Acting
Director of the Maine Center for Disease Control and Prevention;
MAINEHEALTH; GENESIS HEALTHCARE OF MAINE, LLC; GENESIS
HEALTHCARE LLC; MAINEGENERAL HEALTH; NORTHERN LIGHT EASTERN
MAINE MEDICAL CENTER,

Defendants, Appellees,

MTM ACQUISITION, INC., d/b/a Portland Press Herald/Maine Sunday
Telegram, Kennebec Journal, and Morning Sentinel; SJ
ACQUISITION, INC., d/b/a Sun Journal,

Intervenors.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

---

Before

Montecalvo, Selya, and Lynch,
Circuit Judges.

---

* Pursuant to Federal Rule of Appellate Procedure
43(c)(2), Nancy Beardsley has been substituted for Nirav D. Shah
as defendant-appellee.

Mathew D. Staver, with whom Horatio G. Mihet, Roger K. Gannam, Daniel J. Schmid, and Liberty Counsel were on brief, for appellants.

Kimberly L. Patwardhan, Assistant Attorney General, with whom Aaron M. Frey, Attorney General, and Thomas A. Knowlton, Deputy Attorney General, Chief, Litigation Division, were on brief, for appellees Janet T. Mills, Jeanne M. Lambrew, and Nancy Beardsley.

James R. Erwin, Katharine I. Rand, Katherine L. Porter, and Pierce Atwood LLP on brief for appellees MaineHealth, Genesis HealthCare of Maine, LLC, Genesis HealthCare LLC, and MaineGeneral Health.

Ryan P. Dumais and Eaton Peabody on brief for appellee Northern Light Eastern Maine Medical Center.

---

May 25, 2023

---

**LYNCH**, **Circuit Judge**. Since 2021, Maine has required certain healthcare facilities to ensure that their non-remote workers are vaccinated against COVID-19. See 10-144-264 Me. Code R. § 2(A)(7); see also Me. Rev. Stat. Ann. tit. 22, § 802. We refer to this requirement as the "Mandate." The Mandate permits workers to seek exemptions for medical reasons, but not for religious ones. See Me. Rev. Stat. Ann. tit. 22, § 802(4-B); 10-144-264 Me. Code R. § 3. Facilities that do not comply with the Mandate are subject to penalties, including fines and license suspension. See Me. Rev. Stat. Ann. tit. 22, § 804; 10-144-264 Me. Code R. § 7(G).

The plaintiffs in this case are seven Maine healthcare workers who allege that their sincerely held religious beliefs prevent them from receiving any of the available COVID-19 vaccines. After Maine introduced the Mandate, the plaintiffs requested that their employers -- healthcare providers Genesis HealthCare of Maine, LLC; Genesis HealthCare LLC; MaineGeneral Health; MaineHealth; and Northern Light Eastern Maine Medical Center (collectively, the "Providers") -- exempt them from the vaccination requirement based on these religious beliefs. The Providers denied the requests, explaining that religious exemptions were not available under state law. The plaintiffs' employment was later terminated after they refused to accept COVID-19 vaccination.

The plaintiffs filed this suit against three Maine government officials in their official capacities (we refer to them collectively as the "State") and the Providers. The claims against the State assert, among other things, that the Mandate, by allowing medical but not religious exemptions, violates the Free Exercise and Equal Protection Clauses of the U.S. Constitution. Against the Providers, the plaintiffs brought, inter alia, claims under Title VII of the Civil Rights Act of 1964, contending that the Providers' refusal to accommodate the plaintiffs' religious beliefs by exempting them from the vaccination requirement amounted to unlawful employment discrimination on the basis of religion. The district court dismissed the complaint. See Lowe v. Mills, No. 21-cv-00242, 2022 WL 3542187, at *1 (D. Me. Aug. 18, 2022).

We agree with the district court that the complaint's factual allegations establish that violating the Mandate in order to provide the plaintiffs' requested accommodation would have caused undue hardship for the Providers, and so affirm the dismissal of the Title VII claims.[1] But we conclude that the plaintiffs' complaint states claims for relief under the Free Exercise and Equal Protection Clauses, as it is plausible, based on the plaintiffs' allegations and in the absence of further

---

[1] We also affirm the dismissal of several other claims that the plaintiffs do not discuss on appeal.

- 4 -

factual development, that the Mandate treats comparable secular and religious activity dissimilarly without adequate justification.  We affirm in part and reverse in part.

## I.

## A.

Maine law has required that certain licensed healthcare facilities ensure that their employees are vaccinated against various diseases since 1989.[2]  See 1989 Me. Laws ch. 487, § 11 (mandating that employers require proof of either immunization against or serologic immunity to measles and rubella).  Since 2001, the Maine Department of Health and Human Services (the "Department") has had regulatory authority to designate by rule diseases against which healthcare employers must require proof of immunization.  See 2001 Me. Laws ch. 185, § 2.  Prior to the COVID-19 pandemic, the Department required vaccination for measles, mumps, rubella, chickenpox, hepatitis B, and influenza.  10-144-264 Me. Code R. §§ 1(F), 2(A) (2021) (amended Aug. 2021).  The plaintiffs do not challenge the requirement of vaccination against these diseases.

---

[2]    Current law specifies that the vaccination requirements apply to "licensed nursing facilit[ies], residential care facilit[ies], intermediate care facilit[ies] for persons with intellectual disabilities, multi-level health care facilit[ies], hospital[s,] [and] home health agenc[ies]."  Me. Rev. Stat. Ann. tit. 22, § 802(4-A)(A); accord 10-144-264 Me. Code R. § 1(E).

Until 2019, state law allowed exemptions from healthcare-worker vaccination requirements for most diseases under three circumstances: when an employee submitted (1) "a physician's written statement that immunization against one or more diseases may be medically inadvisable," or a written statement that vaccination was contrary to a "sincere [(2)] religious or [(3)] philosophical belief."[3] Me. Rev. Stat. Ann. tit. 22, § 802(4-B)(A)-(B) (2019) (amended 2019). In 2019, Maine's legislature modified these exemptions. See 2019 Me. Laws ch. 154, §§ 8-9. First, it amended the medical exemption to apply where the employee "provides a written statement from a licensed physician, nurse practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization against one or more diseases may be medically inadvisable." Id. § 8. The change took effect September 1, 2021. Id. § 12. Second, the legislature eliminated the religious and philosophical exemptions, with the change taking effect April 19, 2020. See id. § 9. These modifications were the subject of a statewide veto referendum in March 2020; over 72% of voters voted to retain the changes.[4] In April 2021, the Department

___

[3] Maine law also allowed -- and still allows -- an exemption for an individual who "declines [a] hepatitis B vaccine, as provided for by the relevant [federal] law." Me. Rev. Stat. Ann. tit. 22, § 802(4-B)(C). No party argues that this exemption is relevant to this case, so we do not discuss it further.

[4] See Tabulations for Elections Held in 2020, Dep't of the

- 6 -

amended its healthcare-worker vaccination rules, which had previously listed the available exemptions, to cross-reference the exemptions allowed by statute. See 10-144-264 Me. Code R. § 3 (2021) (as amended Apr. 2021; amended Nov. 2021).

In June 2021, the legislature amended the statute governing enforcement of the healthcare-worker vaccination requirements to augment the potential penalties for violations. See 2021 Me. Laws ch. 349, §§ 8-9 (codified at Me. Rev. Stat. Ann. tit. 22, § 804(2)-(3)). The amended statute provides:

> Any person who neglects, violates or refuses to obey the [vaccination] rules or who willfully obstructs or hinders the execution of the rules may be ordered by the [D]epartment . . . to cease and desist. . . . In the case of any person who refuses to obey a cease and desist order issued to enforce the [vaccination] rules . . . , the [D]epartment may impose a fine, which may not be less than $250 or greater than $1,000 for each violation. Each day that the violation remains uncorrected may be counted as a separate offense. . . .
>
> A licensing agency under the [D]epartment may immediately suspend a license . . . for a violation under this section.

Me. Rev. Stat. Ann. tit. 22, § 804(2)-(3).

In August 2021, the Department conducted an emergency rulemaking that added COVID-19 to the list of diseases against which non-remote healthcare workers at licensed facilities,

---

Sec'y of State, https://www.maine.gov/sos/cec/elec/results/results20.html (last visited May 24, 2023).

including the Providers, must be vaccinated.  See 10-144-264 Me.

Code R. §§ 1(F)(7), 2(A)(7) (2021) (as amended Aug. 2021; amended

Nov. 2021).  The Department made this change permanent in November

2021.[5]  See id. (as amended Nov. 2021).  The Mandate is the product

of this rule and the related state statutes.

**B.**

Because this appeal follows a dismissal for failure to

state a claim, we draw the facts from the plaintiffs' complaint.

See, e.g., Douglas v. Hirshon, 63 F.4th 49, 52 (1st Cir. 2023).

The plaintiffs in this case are seven individuals

formerly employed by the Providers in positions covered by the

Mandate.[6]  The plaintiffs allege that they object to receiving any

of the available COVID-19 vaccines on religious grounds "because

of the connection between the . . . vaccines and the cell lines of

aborted fetuses . . . in the vaccines' origination, production,

development, testing, or other inputs," which conflicts with the

plaintiffs' belief "that all life is sacred, from the moment of

---

[5]    The permanent rule differs in some respects from the
emergency rule; for instance, it does not cover dental or emergency
medical services providers, which the emergency rule had reached.
Compare 10-144-264 Me. Code R. § 1, with id. (2021) (as amended
Aug. 2021; amended Nov. 2021).  No party argues that these
differences are relevant to this appeal.

[6]    Three of the plaintiffs formerly worked for Northern
Light Eastern Maine Medical Center, two worked for Genesis
HealthCare, and one worked for each of MaineGeneral Health and
MaineHealth.

conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life."

Each plaintiff requested a religious "exemption and accommodation" from his or her employer excusing him or her from vaccination. The plaintiffs "offered, and [were] ready, willing, and able to comply with . . . [other] health and safety requirements to facilitate their religious exemption," such as by "wear[ing] facial coverings, submit[ting] to reasonable testing and reporting requirements, [and] monitor[ing] symptoms."

The Providers denied each request, explaining in their responses that the Mandate did not permit religious exemptions. After the plaintiffs refused to accept vaccination, they were terminated from their employment.

## C.

The original complaint in this action was filed on August 25, 2021, in the U.S. District Court for the District of Maine against Governor Janet Mills, Department Commissioner Jeanne Lambrew, and then-Maine Center for Disease Control and Prevention ("Maine CDC") Director Nirav Shah[7] (the officials we refer to collectively as the "State") and the Providers.[8] The complaint,

---

[7] Shah left office while this appeal was pending; Nancy Beardsley has been substituted as a defendant-appellee. See Fed. R. App. P. 43(c)(2).

[8] The complaint originally named as a defendant the Northern Light Health Foundation. Northern Light Eastern Maine Medical Center was substituted as a defendant in January 2022,

- 9 -

filed using pseudonyms for the plaintiffs, listed as plaintiffs six "Jane Does" and three "John Does" who allegedly worked in healthcare settings and objected to the Mandate on religious grounds.[9] Seven of the plaintiffs alleged that they were employees or former employees of the Providers, one alleged that he was an employer who objected to requiring his employees to comply with the Mandate, and one alleged that she was employed by this employer plaintiff.

The complaint included five counts. Against the State, it challenged the Mandate under the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause. Against the Providers, it raised Title VII claims for failure to accommodate the plaintiffs' religious beliefs. And it alleged that all defendants had violated the Supremacy Clause by purportedly claiming that the Mandate superseded Title VII's requirements, and had conspired to violate the plaintiffs' civil rights in violation of 42 U.S.C. § 1985. The plaintiffs sought declaratory and injunctive relief, as well as damages.

The same day the complaint was filed, the plaintiffs moved for a temporary restraining order and preliminary injunction

---

prior to the filing of the operative amended complaint.

[9] The complaint also listed as plaintiffs two thousand "Jack Does" and "Joan Does" who allegedly had "been told not to" seek religious exemptions from the Mandate or had sought such exemptions and been denied them.

barring the State from enforcing the Mandate against the employer plaintiff and requiring the Providers to grant the employee plaintiffs religious exemptions from COVID-19 vaccination. The district court denied the motion. See Does 1-6 v. Mills, 566 F. Supp. 3d 34, 39 (D. Me. 2021). This court affirmed, concluding that the plaintiffs had not shown a likelihood of success on the merits, that they would likely suffer irreparable harm absent preliminary relief, or that the balance of the equities or the public interest favored an injunction.[10] See Does 1-6 v. Mills, 16 F.4th 20, 29-37 (1st Cir. 2021), cert. denied sub nom. Does 1-3 v. Mills, 142 S. Ct. 1112 (2022). The Supreme Court denied the plaintiffs' application for injunctive relief, see Does 1-3 v. Mills, 142 S. Ct. 17, 17 (2021) (mem.), and their petition for certiorari, see Does 1-3, 142 S. Ct. at 1112.

---

[10] This court's decision on the plaintiffs' preliminary injunction appeal does not control the outcome in this appeal because the different procedural postures implicate different burdens, standards of review, and factual records. That decision evaluated, based on evidence submitted by all parties, whether the district court had abused its discretion in denying the preliminary injunction motion, and whether the plaintiffs had met their burden of showing, among other things, both a likelihood of success on the merits and irreparable harm. See Does 1-6 v. Mills, 16 F.4th 20, 29-30 (1st Cir. 2021), cert. denied sub nom. Does 1-3 v. Mills, 142 S. Ct. 1112 (2022). In contrast, we review a dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo based on a record limited to the complaint's well-pleaded allegations, which need only make out plausible claims with all reasonable inferences drawn in the plaintiffs' favor. See, e.g., Frese v. Formella, 53 F.4th 1, 5-6 (1st Cir. 2022). The defendants properly do not contend that the result in Mills is binding in this appeal.

- 11 -

After remand to the district court, two Maine newspapers intervened in the case to challenge the plaintiffs' use of pseudonyms. The district court granted the newspapers' motion to unseal the plaintiffs' identities and ordered the plaintiffs to file an amended complaint identifying themselves by name, see Does 1-6 v. Mills, No. 21-cv-00242, 2022 WL 1747848, at *7 (D. Me. May 31, 2022), and this court denied a stay of the order pending appeal, see Does 1-3 v. Mills, 39 F.4th 20, 22 (1st Cir. 2022). Following this court's decision, the plaintiffs voluntarily dismissed their appeal.

The plaintiffs filed the operative first amended complaint (the "complaint") in July 2022. This amended pleading removes some of the original plaintiffs (leaving only the seven plaintiffs who allege they were employed by the Providers), identifies the remaining plaintiffs by name, and updates some factual allegations to reflect developments since the original complaint's filing (such as the plaintiffs' termination from their employment with the Providers), but includes the same claims as the original complaint.

The defendants moved to dismiss. The State argued that some of the claims must be dismissed for lack of jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(1), asserting that the plaintiffs lack standing to sue Governor Mills, who does not play a role in enforcing the Mandate, and that the Eleventh

Amendment bars the claims for money damages against the State. The State did not make similar jurisdictional arguments with respect to the non-damages claims for relief against the other Maine officials. The defendants also argued that the plaintiffs' allegations with respect to the other counts fail to state claims under Rule 12(b)(6). The plaintiffs opposed the motions, though they did not respond to the State's arguments limited to Rule 12(b)(1).

The district court granted the defendants' motions and dismissed the complaint. See Lowe, 2022 WL 3542187, at *1. It first dismissed the claims against Governor Mills and the damages claims against the State because the plaintiffs had failed to respond to the State's Rule 12(b)(1) arguments. See id. at *6. Turning to the Rule 12(b)(6) motions, the court concluded that the Mandate is a religiously neutral law of general applicability that is rationally related to Maine's legitimate public health interests, and so does not violate the Free Exercise or Equal Protection Clauses. See id. at *10-15. And it reasoned that the plaintiffs' factual allegations establish that the Providers could not have offered the plaintiffs their requested accommodation without violating state law and risking onerous penalties, creating an undue hardship that precludes liability under Title VII. See id. at *6-10. Finally, it concluded that the Supremacy Clause does not provide a distinct cause of action and that the

complaint's allegations with respect to the conspiracy count were too vague and conclusory to support a plausible claim, and so dismissed the Supremacy Clause and conspiracy claims. See id. at *15.

This timely appeal followed.

## II.

We review a district court's dismissal of a complaint under Rule 12(b)(6) de novo. E.g., Douglas, 63 F.4th at 54-55. To avoid dismissal, "[t]he complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Id. at 55 (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "We take the complaint's well-pleaded facts as true, and we draw all reasonable inferences in [the plaintiffs'] favor." Frese v. Formella, 53 F.4th 1, 5 (1st Cir. 2022) (quoting Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018)). At this stage, we "ordinarily may only consider facts alleged in the complaint and exhibits attached thereto," Freeman v. Town of Hudson, 714 F.3d 29, 35 (1st Cir. 2013), although we may also consider materials "fairly incorporated" in the complaint or subject to judicial notice, Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 12 (1st Cir. 2004).

The plaintiffs' briefing on appeal does not address the dismissal of the claims against Governor Mills, the damages claims

against the State, or the Supremacy Clause and § 1985 conspiracy claims. The plaintiffs have thus waived any arguments on those points, and we affirm those aspects of the district court's decision. See, e.g., Douglas, 63 F.4th at 54 n.6. That leaves the free exercise and equal protection claims against the State and the Title VII claims against the Providers at issue.

**A.**

**1.**

We begin with the free exercise claim. "The First Amendment's Free Exercise Clause, as incorporated against the states by the Fourteenth Amendment, protects religious liberty against government interference." Mills, 16 F.4th at 29. A key issue with respect to this claim is the appropriate standard of scrutiny. A law that incidentally burdens religion is subject only to rational basis review if it is religiously neutral and generally applicable. E.g., id. A law that is not neutral or generally applicable is subject to strict scrutiny. E.g., id. A law is not generally applicable if it "treat[s] any comparable secular activity more favorably than religious exercise." Tandon v. Newsom, 141 S. Ct. 1294, 1296 (2021) (per curiam); see also Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1877 (2021) ("A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). Applying the

- 15 -

Rule 12(b)(6) standard and drawing all reasonable inferences in the plaintiffs' favor, we conclude that it is plausible, in the absence of any factual development, that the Mandate falls in this category, based on the complaint's allegations that the Mandate allows some number of unvaccinated individuals to continue working in healthcare facilities based on medical exemptions while refusing to allow individuals to continue working while unvaccinated for religious reasons.

The Supreme Court has explained that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," and that "[c]omparability is concerned with the risks various activities pose." Tandon, 141 S. Ct. at 1296; see also We the Patriots USA, Inc. v. Hochul, 17 F.4th 266, 285-88 (2d Cir. 2021) (conducting comparability analysis in context of New York vaccine mandate for healthcare workers). Tandon, for example, held that a group of plaintiffs was likely to succeed in a free exercise challenge to a California law that, in response to the COVID-19 pandemic, sought to reduce the virus's spread by limiting religious gatherings in homes to no more than three households, but "permitt[ed] hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time." 141 S. Ct. at 1297; see id. at

- 16 -

1298 (Kagan, J., dissenting). The Court determined that these secular activities were comparable to the prohibited religious gatherings because the record did not show that they "pose[d] a lesser risk of transmission than [the plaintiffs'] proposed religious exercise at home." Id. at 1297 (majority opinion).

As its principal interest in permitting medical but not religious exemptions to the Mandate, the State cites a goal of "revers[ing] the trajectory of falling vaccination rates in order to prevent communicable, preventable diseases from spreading in . . . healthcare facilities . . . so that all persons medically unable to be vaccinated [can] be protected." The State also cites a more general interest in "protecting the lives and health of Maine people." (Quoting Lowe, 2022 WL 3542187, at *14.) Drawing all reasonable inferences in the plaintiffs' favor, it is plausible based on the plaintiffs' allegations that the medical exemption undermines these interests in a similar way to a hypothetical religious exemption. The availability of a medical exemption, like a religious exemption, could reduce vaccination rates among healthcare workers and increase the risk of disease spread in healthcare facilities, compared to a counterfactual in which the Mandate contains no exceptions, all workers must be vaccinated, and neither religious objectors nor the medically ineligible can continue working in healthcare facilities. Cf. Tandon, 141 S. Ct. at 1297 (comparing risk of disease transmission).

- 17 -

The State argues that comparing the risks created by the two exemptions in this way is inappropriate because "Maine's asserted interest in providing only a medical exemption . . . is not based on comparative assessments of risk," but instead on keeping vaccination rates high to protect Mainers, and especially Mainers medically unable to be vaccinated. But the State has not asserted an independent interest in maximizing vaccination rates apart from the public health benefits of doing so, and the Supreme Court has instructed us to assess comparability in the public health context based on "the risks various activities pose." Id. at 1296. The State's argument that it did not independently conduct this type of analysis is, if anything, a reason to be skeptical that dismissal is appropriate absent further factual development.

The State also references in passing an interest in "safeguarding Maine's healthcare capacity." (Quoting Lowe, 2022 WL 3542187, at *14.) While excusing some workers from vaccination for medical reasons may protect Maine's "healthcare capacity" by making more workers available, authorizing a religious exemption plausibly could have a similar effect. We thus cannot conclude, at least without more facts, that this interest renders the two exemptions incomparable.

The State asserts that the medical exemption is "fundamentally different . . . [from] a religious exemption because

a medical exemption aligns with the State's interest in protecting public health and, more specifically, medically vulnerable individuals from illness and infectious diseases, while non-medical exemptions . . . do not."  (Quoting Lowe, 2022 WL 3542187, at *12.)  But, drawing all reasonable inferences in the plaintiffs' favor, it is plausible that a version of the Mandate that did not include a medical exemption could do an even better job of serving the State's asserted public health goals, and that the inclusion of the medical exemption undermines the State's interests in the same way that a religious exemption would by introducing unvaccinated individuals into healthcare facilities.

Of course, it is entirely possible that additional facts might show that the two types of exemption are not comparable.  For example (and not by way of limitation), it may be that medical exemptions are likely to be rarer, more time limited, or more geographically diffuse than religious exemptions, such that the two exemptions would not have comparable public health effects.  Cf. We the Patriots, 17 F.4th at 286 (discussing evidence suggesting that medical and religious exemptions to a New York vaccine mandate were "not comparable in terms of the 'risk' that they pose[d]" (quoting Tandon, 141 S. Ct. at 1296)).  We reject the plaintiffs' apparent view that the only relevant comparison is between the risks posed by any one individual who is unvaccinated for religious reasons and one who is unvaccinated for medical

reasons. Instead, we agree with the Second Circuit that Supreme Court precedent "suggests the appropriateness of considering aggregate data about transmission risks." Id. at 287; see id. at 286-87 ("We doubt that, as an epidemiological matter, the number of people seeking exemptions is somehow excluded from the factors that the State must take into account in assessing the relative risks to the health of healthcare workers and the efficacy of its vaccination strategy . . . ."). But, absent factual development, dismissal is unwarranted.

The State does advance a comparability argument based on facts outside the complaint that it argues we may nonetheless properly consider. The State cites a Federal Centers for Medicare and Medicaid Services ("CMS") interim final rule governing staff vaccination requirements in certain healthcare facilities, including hospitals and long-term care facilities, that receive Medicare and Medicaid funds, which the State represents "covers many of the same healthcare entities as Maine's [Mandate]." See Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021) (codified at 42 C.F.R. pts. 416, 418, 441, 460, 482-86, 491, 494). The State observes that CMS's explanation of the regulation states that the rule preempts state laws "providing for exemptions to the extent such law[s] provide[] broader grounds for exemptions than provided for by Federal law," id. at 61,613, and argues that the medical

exemption permitted under the CMS rule, which requires a worker seeking an exemption to provide signed documentation from a "licensed practitioner" that the worker has "recognized clinical contraindications to COVID-19 vaccines," e.g., id. at 61,619-20, is more restrictive than the medical exemption under Maine law, see Me. Rev. Stat. Ann. tit. 22, § 802(4-B)(A), such that, in practice, only the narrower medical exemption under the CMS rule will be available in at least some of the facilities covered by the Mandate.

The State then argues that this narrower CMS medical exemption would permit only a small number of healthcare workers to obtain medical exemptions from the Mandate. Citing a U.S. Centers for Disease Control and Prevention ("CDC") fact sheet, the State represents that "CDC[-]recognized contraindications to vaccination are limited to [(1)] known allergies [to vaccine components], [and (2)] severe allergic reactions (anaphylaxis) . . . and [(3)] cardiac conditions (TTS) occurring after the administration of a prior dose of a COVID-19 vaccine."[11] Citing a CDC webpage, the State argues that at least two of these

---

[11] The original source cited by the State appears no longer to be available online. For an archived version, see U.S. CDC, Summary Document for Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized or Approved in the United States (Dec. 6, 2022), https://web.archive.org/web/20221221222603/https://www.cdc.gov/vaccines/covid-19/downloads/summary-interim-clinical-considerations.pdf.

three contraindications are vanishingly rare -- with approximately five instances of anaphylaxis and four cases of TTS occurring per million vaccine doses administered -- such that "the approximately 11 or 12 persons that would suffer an adverse reaction to a COVID-19 vaccination based on Maine's entire population (not just persons subject to the [Mandate]) is about the same [as the] number of [plaintiffs] in this appeal."[12]  On that basis, the State argues that "[t]he risks between medical and religious exemptions are . . . not comparable."

Comparisons of this sort may well be relevant to the comparability inquiry. See We the Patriots, 17 F.4th at 286.  But these limited data are insufficient to resolve the comparability inquiry at the motion-to-dismiss stage -- even assuming we may properly consider them. Cf. Freeman, 714 F.3d at 35-37 (discussing limits on consideration of materials outside complaint in evaluating motion to dismiss).  Even accepting, for the sake of argument, the State's premise that the narrower medical exemption under the CMS rule is relevant to the comparability analysis in this case, its interpretation of the CMS rule and the CDC's clinical recommendations, and its calculations about the prevalence of anaphylaxis and TTS, there are several significant

---

[12]  For the State's source, see Selected Adverse Events Reported After COVID-19 Vaccination, U.S. CDC (Mar. 7, 2023), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html.

gaps in the State's argument. First, the State does not explain how many facilities and workers covered by the Mandate actually fall within the CMS rule's coverage, simply stating that "many" do.[13] Second, it does not address how many individuals might qualify for medical exemptions under the CMS rule based on known allergies to COVID-19 vaccines; it instead discusses the prevalence of only two of the three contraindications it describes. Third, the State's argument does not show how many individuals would likely seek religious exemptions from the Mandate, were they available, instead assuming that the number would be significantly greater than the number of plaintiffs in this case. Given those gaps, and the requirement at this stage to draw all reasonable inferences in the plaintiffs' favor, it remains plausible that the Mandate's medical exemption creates comparable risks to those that would be created by a religious exemption, warranting strict scrutiny.[14]

---

[13]    The plaintiffs' counsel stated at oral argument that the plaintiffs in this case worked at facilities covered by the CMS rule. But the State has not developed any argument that we should look only at facilities covered both by the CMS rule and the Mandate for purposes of assessing the Mandate's constitutionality. We express no view on the merits of such an argument, were the State to advance it, but, absent such an argument, we decline to so constrain the inquiry.

[14]    Our conclusion that it is plausible that the Mandate is subject to strict scrutiny on this basis makes it unnecessary at this stage to address the other arguments for strict scrutiny advanced by the plaintiffs, such as the assertion that the Mandate is not generally applicable because it creates "a mechanism for individualized exemptions." Fulton, 141 S. Ct. at 1877 (quoting

- 23 -

Because it is plausible, based on the complaint and without the benefit of factual development, that the Mandate is subject to strict scrutiny, dismissal would be appropriate only if the materials we may consider on a motion to dismiss establish that the Mandate survives that standard of review even when applying the Rule 12(b)(6) plausibility standard. Cf. Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (discussing circumstances in which affirmative defense, for which defendant bears burden of proof, may be adjudicated on motion to dismiss). Strict scrutiny requires the State to show that the Mandate is narrowly tailored to advance a compelling government interest. See, e.g., Fulton, 141 S. Ct. at 1881. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." Id.

The State does briefly contend that the Mandate survives strict scrutiny, but its argument does not justify dismissal on the pleadings. It argues that a statement issued by the Maine CDC in November 2021, when the agency made the regulation requiring COVID-19 vaccination for healthcare workers permanent, establishes that the Mandate is the least restrictive means to achieve the State's public health goals. The statement discusses the agency's reasoning concerning why alternative measures, such as mandatory

Emp. Div. v. Smith, 494 U.S. 872, 884 (1990)).

- 24 -

masking, were insufficient to prevent the spread of COVID-19. But the cited discussion is insufficient, standing alone, to satisfy the State's burden under strict scrutiny. For example, it does not address the likely effects of including a religious exemption in the Mandate or give reasons why doing so would prevent the state from achieving its public health goals.[15]  Cf. id. at 1881-82 (holding that a government defendant had not shown that a religious exemption to a challenged policy would undermine the interests the policy aimed to advance so as to satisfy strict scrutiny). As a result, even assuming we may properly consider the statement at the motion-to-dismiss stage, cf. Freeman, 714 F.3d at 35-37, it does not establish that the Mandate satisfies strict scrutiny and, thus, that dismissal is appropriate.

We emphasize the narrowness of our holding. We do not determine what standard of scrutiny should ultimately apply to the free exercise claim. Nor do we decide whether the Mandate survives the applicable level of scrutiny. Those questions are not before us. We hold only that, applying the plausibility standard applicable to Rule 12(b)(6) motions and drawing all reasonable inferences from the complaint's factual allegations in the

---

[15]     A portion of the agency's statement not cited by the State does reference the possibility of religious exemptions to the Mandate, but only in observing that the state legislature had eliminated the option for such exemptions by statute in 2019. It does not independently analyze the likely effects of such exemptions.

plaintiffs' favor, the complaint states a claim under the Free Exercise Clause.

## 2.

We next consider the plaintiffs' equal protection claim, which alleges that the Mandate burdens their free exercise rights and discriminates on the basis of religion. The district court reasoned that, because it had concluded that the free exercise claim warranted only rational basis review, an equal protection claim resting on the assertion that the Mandate burdens the plaintiffs' free exercise rights must also receive rational basis review. Lowe, 2022 WL 3542187, at *14-15 (citing Wirzburger v. Galvin, 412 F.3d 271, 282-83 (1st Cir. 2005)). The court determined that the Mandate survives rational basis review under the Equal Protection Clause for the same reasons as in the free exercise context. See id. at *15. On appeal, the State endorses this reasoning. It does not develop any argument that, if we reverse the dismissal of the free exercise claim, we can nonetheless affirm the dismissal of the equal protection claim. As a result, because we reverse the dismissal of the free exercise claim, we also reverse the dismissal of the equal protection claim.

## B.

We turn to the plaintiffs' Title VII claims against their former employers, the Providers. As relevant here, Title VII declares it an "unlawful employment practice for an

employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). The statute defines "religion" to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." Id. § 2000e(j).

This court "appl[ies] a two-part framework in analyzing religious discrimination claims under Title VII." Sánchez-Rodríguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 12 (1st Cir. 2012). "First, [a] plaintiff must make [her] prima facie case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." Id. (quoting Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004)). "[T]he burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." Cloutier, 390 F.3d at 133. The Providers do not dispute that the plaintiffs have adequately alleged a prima facie case sufficient to survive a Rule 12(b)(6) motion, and do not claim that they offered any reasonable

accommodation of the plaintiffs' religious practices.  As to the Providers, this appeal thus turns on their undue hardship defense.

Although undue hardship is an affirmative defense, see id., dismissal on a Rule 12(b)(6) motion is nonetheless appropriate if "the facts establishing the defense [are] clear on the face of the plaintiff[s'] pleadings" and "there is 'no doubt' that the plaintiff[s'] claim[s] [are] barred," Zenon, 924 F.3d at 616 (first alteration in original) (internal quotation marks omitted) (first quoting Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 114 (1st Cir. 2009); and then quoting Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001)).  The complaint and the plaintiffs' briefing make clear that the plaintiffs would accept only one accommodation: a religious exemption allowing them to continue in their roles without receiving a vaccine while observing other precautions, such as masking and testing.[16]  We thus need only determine whether that accommodation would have constituted an undue hardship.[17]  See Cloutier, 390 F.3d at 134-35.  We agree with

---

[16]    In their reply brief, the plaintiffs attempt to draw a distinction between their requested exemption from the Mandate and what they separately describe as their proposed accommodation of continuing in their previous roles while complying with safeguards such as masking and testing.  Because this issue was not raised in their opening brief, we deem it waived.  See, e.g., FinSight I LP v. Seaver, 50 F.4th 226, 235 (1st Cir. 2022).

[17]    At points in their briefing, the plaintiffs take issue with the alleged failure by the Providers to "provide at least a process for seeking an accommodation."  As this court has explained in the context of the Americans with Disabilities Act, "liability for failure to engage in an interactive process depends on a

the district court that it would, and reject the plaintiffs' arguments to the contrary.

**1.**

Maine law makes clear that, by providing the plaintiffs their requested accommodation as described in the complaint, the Providers would have risked onerous penalties, including license suspension. The Mandate requires the Providers to "require for all employees who do not exclusively work remotely [and who are not medically exempted] a [c]ertificate of [i]mmunization . . . against . . . COVID-19." 10-144-264 Me. Code R. § 2(A); see Me. Rev. Stat. Ann. tit. 22, § 802(4-B) (allowing medical exemptions); 10-144-264 Me. Code R. § 3 (permitting medical exemptions by cross-referencing section 802). Granting the plaintiffs their requested religious exemption would thus have placed the Providers in violation of the Mandate. The penalties for such a violation are burdensome. By statute, the Department's licensing authorities "may immediately suspend a [healthcare facility's] license . . . for a violation [of the Mandate]," and regulators may also impose substantial fines. Me. Rev. Stat. Ann. tit. 22, § 804(3); see id. § 804(2) (authorizing the Department to issue cease-and-desist

finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts." Trahan v. Wayfair Me., LLC, 957 F.3d 54, 67 (1st Cir. 2020); see also Mills, 16 F.4th at 36 (applying this reasoning to Title VII claim). Nothing in the complaint suggests -- and the plaintiffs do not argue -- that such a resolution was possible here.

- 29 -

orders to violators, with noncompliance punishable by fines of up to $1,000 per violation per day).

The complaint itself acknowledges the threat to the Providers' licenses. Quoting a press release from the Governor's office announcing the Mandate, it states: "[T]he [healthcare] organizations to which th[e] [Mandate] applies must ensure that each employee is vaccinated, with this requirement being enforced as a condition of the facilities' licensure."[18] The complaint then declares (in bolded text): **"Thus, the Governor has threatened to revoke the licenses of all health care employers who fail to mandate that all employees receive the COVID-19 vaccine."** The only reasonable inference from this allegation and from the relevant Maine law, both of which we may properly consider in reviewing the dismissal of the Title VII claims, see Eves v. LePage, 927 F.3d 575, 578 n.2 (1st Cir. 2019) (en banc), is that granting the requested accommodation would have exposed the Providers to a substantial risk of license suspension, as well as monetary penalties.

The plaintiffs' counsel essentially agreed with this conclusion at oral argument. Counsel observed that the State had

---

[18] See Press Release, Janet T. Mills, Governor, State of Maine, Mills Administration Requires Health Care Workers to Be Fully Vaccinated Against COVID-19 by October 1 (Aug. 12, 2021), https://www.maine.gov/governor/mills/news/mills-administration-requires-health-care-workers-be-fully-vaccinated-against-covid-19-october.

"made clear that . . . exemptions could be granted only for medical reasons," that granting the plaintiffs' desired accommodation would require violating the Mandate, and that "noncompliant employers would face fines and loss of licensure." He reiterated:

> Maine . . . [went] to the extreme to say [that] no one can grant a religious exemption, and that if an employer grants a religious-based exemption, they could lose their license and they will be fined. That is an extraordinary step by the State of Maine against its employers . . . . It puts the employers to a great extent in this damned-if-you-do, damned-if-you-don't . . . situation.

And he acknowledged that "obviously, [the plaintiffs'] real interest is with the State."

The risk of license suspension for violating the Mandate would have constituted an "undue hardship on the conduct of the [Providers'] business" under any plausible interpretation of that phrase. 42 U.S.C. § 2000e(j). Title VII does not define "undue hardship," see id. § 2000e, but current law holds that "[a]n accommodation constitutes an 'undue hardship' if it would impose more than a de minimis cost on the employer," Cloutier, 390 F.3d at 134 (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 (1977)). Cloutier, for example, held that it would have caused undue hardship to require a retailer to permit a cashier to wear facial piercings while working "because [doing so] would adversely affect the employer's public image," as the retailer "ha[d] made a determination that facial piercings, aside from

earrings, detract from the 'neat, clean and professional image' that it aim[ed] to cultivate," and "[s]uch a business determination [was] within [the retailer's] discretion." Id. at 136; see id. at 135-36. The hardship in this case is far more significant: rather than having some intangible effect on the Providers' public images that could -- in their own discretionary judgment -- eventually harm their revenues, license suspension would concretely disrupt the Providers' "conduct of [their] business." 42 U.S.C. § 2000e(j).

We are aware that the Supreme Court has heard argument in a case in which the petitioner asks it to reconsider the more-than-de-minimis-cost interpretation of "undue hardship," see Groff v. DeJoy, No. 22-174 (U.S. argued Apr. 18, 2023), but our holding is not dependent on that formulation of the legal standard. Rather, we hold that the plaintiffs' requested accommodation would have constituted an undue hardship under any plausible interpretation of the statutory text. For example, the Americans with Disabilities Act ("ADA") also includes an "undue hardship" defense: the Act forbids "discriminat[ion] [in employment] against a qualified individual on the basis of disability," 42 U.S.C § 12112(a), including by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship

on the operation of [its] business," id. § 12112(b)(5)(A). The statute defines "undue hardship" to "mean[] an action requiring significant difficulty or expense, when considered in light of [a statutorily defined list of] factors." Id. § 12111(10)(A); see also Small v. Memphis Light, Gas & Water, 952 F.3d 821, 826-27 (6th Cir. 2020) (Thapar, J., concurring) (arguing for an interpretation of "undue hardship" under Title VII that requires "significant costs on the [employer]"); Brief for Petitioner at 17-28, Groff, No. 22-174 (U.S. Feb. 21, 2023) (similar). The risk of license suspension facing the Providers would readily meet this standard, too; indeed, it is difficult to imagine a penalty that would cause a healthcare provider more significant difficulty "[i]n the conduct of [its] business," 42 U.S.C. § 2000e(j), than license suspension. Cf. EEOC v. Amego, Inc., 110 F.3d 135, 148 & n.15 (1st Cir. 1997) (concluding that accommodation would have constituted undue hardship under ADA where it would have required nonprofit to hire additional staff it could not realistically afford).

Other circuits' caselaw addressing the interaction between Title VII's undue hardship defense and state law supports our conclusion. For example, the Third Circuit, in United States v. Board of Education, 911 F.2d 882 (3d Cir. 1990), concluded that an accommodation would have constituted an undue hardship for an employer school board where it would have required the board's

- 33 -

administrators to violate a state criminal statute, thereby "expos[ing] [the] administrators to a substantial risk of criminal prosecution, fines, and expulsion from the profession."[19] Id. at 891; see id. at 890-91. While violating the Mandate would not carry a risk of criminal charges, it would create a substantial risk of enforcement, fines, and license suspension. Indeed, the threat to the Providers' business is, if anything, more direct in this case than in Board of Education, where the court discussed a risk of charges against the defendant's employees, see id. at 891; here, the objects of enforcement actions would be the Providers themselves, see Me. Rev. Stat. Ann. tit. 22, § 804(2)-(3).

The Ninth Circuit has similarly held that accommodations that would force private employers to "risk liability for violating" state law constitute undue hardships under Title VII.[20]

---

[19] The Third Circuit declined to "address the situation in which . . . the chances of enforcement are negligible and accommodation involves no realistic hardship," or "the situation in which the defendant is a government entity with the authority . . . to control whether or not enforcement actions will be brought." 911 F.2d at 891. No such situation obtains here: as discussed above, neither state law nor the complaint provide any reason to doubt that enforcement was likely.

[20] The Ninth Circuit recently declined to extend this rule to a state agency acting as an employer, reasoning that the agency was "part of the very state government that [was] responsible for creating and enforcing" the state law at issue, such that there was a lesser likelihood that the state law would be enforced against the agency and a risk that states could pass laws designed to excuse their agencies from compliance with Title VII. Bolden-Hardge v. Off. of the Cal. State Controller, 63 F.4th 1215, 1225 (9th Cir. 2023); see id. at 1225-27. The Providers are

- 34 -

Bhatia v. Chevron U.S.A., Inc., 734 F.2d 1382, 1384 (9th Cir. 1984); see also Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law."); Tagore v. United States, 735 F.3d 324, 329-30 (5th Cir. 2013) (citing Sutton with approval in a case involving a proposed accommodation that would require an employer to violate federal law).

Several circuits have also held that accommodations that would require employers to violate other federal laws are not required by Title VII -- sometimes on the theory that such a violation precludes the plaintiff from making out a prima facie case, and sometimes on the theory that such an accommodation would constitute an undue hardship. See Truskey v. Vilsack, No. 21-5821, 2022 WL 3572980, at *3 (6th Cir. Aug. 19, 2022) (unpublished decision) (collecting cases from Fourth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits).

We need not and do not decide whether every accommodation that would require an employer to violate state or federal law would necessarily constitute an undue hardship under Title VII. But these out-of-circuit decisions confirm that potential

_____

private employers, so this reasoning does not apply here.

- 35 -

penalties for violating other laws can render a proposed accommodation an undue hardship. And, for the reasons described above, we hold that this case falls in that category.

## 2.

The plaintiffs' counterarguments fail. Importantly, they do not develop any meaningful argument that the risk of license suspension in this case is insufficiently burdensome as to have constituted an undue hardship for the Providers. Indeed, as discussed above, the plaintiffs' counsel at oral argument acknowledged the difficulty faced by the Providers, characterizing it as a "damned-if-you-do, damned-if-you-don't . . . situation." The plaintiffs instead argue that factual issues make dismissal under Rule 12(b)(6) inappropriate and that Title VII preempts the Mandate and requires the Providers to grant the requested accommodation. We find these contentions unpersuasive.

The plaintiffs assert generally that whether their requested accommodation would constitute an undue hardship "is a question of fact not suitable for determination on a motion to dismiss." As discussed above, however, we conclude that the complaint's allegations and the relevant Maine law permit no reasonable inference but that granting the plaintiffs their requested accommodation would have exposed the Providers to a substantial risk of license suspension and other penalties, creating an undue hardship. See Zenon, 924 F.3d at 616 (discussing

adjudication of affirmative defenses at Rule 12(b)(6) stage); see also Iqbal, 556 U.S. at 678 (describing Rule 12(b)(6) plausibility standard).

The plaintiffs offer two more specific purported factual issues that, they argue, preclude dismissal, but these arguments fare no better. First, they contend that they "plead[ed] and offered available alternatives to compulsory vaccination," such as masking and testing. This argument misunderstands the undue hardship that the Providers cite, which is not the safety risk from allowing the plaintiffs to work while unvaccinated, but instead the penalties that the Providers would have faced for violating the Mandate. Those penalties would have applied -- and constituted an undue hardship -- regardless of the factual merits of the plaintiffs' view that their proposed alternatives would be adequate in terms of safety.

Second, the plaintiffs argue in their briefing, based on a Department guidance document, that their requested accommodation would not actually have violated the Mandate. The guidance document at issue states that the Mandate "does not prohibit employers from providing accommodations for employees' sincerely held religious beliefs, observances, or practices that may otherwise be required by Title VII," but that "implementation, if such accommodations are provided by a [healthcare employer], must

comply with the [Mandate]."[21]  The plaintiffs assert that the first piece of quoted language shows that the Providers could lawfully have granted their requested accommodation.  But this reading ignores the second piece of quoted language; read as a whole, the guidance document makes plain that employers could provide religious accommodations other than exemptions (for instance, by authorizing remote work, which would place the worker outside the Mandate's scope) but could not offer religious exemptions to workers covered by the Mandate (since doing so would not comply with the Mandate).  The plaintiffs have never alleged or argued that they would have accepted any accommodations that would have placed them outside the Mandate's scope.  And certainly the Providers could not have confidently relied on the guidance document to conclude that offering religious exemptions would not expose them to penalties for violating the Mandate, such as would render the plaintiffs' requested accommodation not an undue hardship.  Indeed, the plaintiffs' counsel appeared to retreat from this argument at oral argument, recognizing that "the Maine CDC made clear that . . . exemptions could be granted only for medical reasons," and that "if [the Providers] . . . even consider

_____

[21]    Health Care Worker Vaccination FAQs, State of Me. COVID-19 Response (Nov. 10, 2021), https://www.maine.gov/covid19/vaccines/public-faq/health-care-worker-vaccination.

- 38 -

[religious exemptions], then they're violating the . . . Mandate." The guidance document does not save the Title VII claim.

In their final counterargument, the plaintiffs assert that Title VII preempts the Mandate, such that the Providers were required to offer the requested accommodation notwithstanding state law. The Supreme Court has explained that Title VII preempts state laws "only if they actually conflict with federal law." Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281 (1987); see id. at 281-83 (discussing "[t]he narrow scope of pre-emption available under [Title VII]"). The plaintiffs' argument fails because there is no "actual[] conflict" in this case. As relevant here, Title VII could preempt the Mandate only if it required the Providers to grant the plaintiffs' requested accommodation. But granting that accommodation would have exposed the Providers to penalties for violating the Mandate, and thus constituted an undue hardship not required by Title VII.

This conclusion follows from Title VII's text and structure, which make clear that the undue hardship analysis precedes any conclusion about preemption of state law. The undue hardship defense is built into the statutory definition of "religion," see 42 U.S.C. § 2000e(j), such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies, see, e.g.,

<u>Bd. of Educ.</u>, 911 F.2d at 886. In other words, while the plaintiffs' counsel at oral argument stated that the need to comply with the Mandate, on the one hand, and with Title VII, on the other, placed the Providers in a "damned-if-you-do, damned-if-you-don't . . . situation," the undue hardship defense clearly applies on the pleadings. Because the requested accommodation would have imposed undue hardship, Title VII does not require it.

The plaintiffs rely on 42 U.S.C. § 2000e-7, which provides:

> Nothing in [Title VII] shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State . . . , other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under [Title VII].

They argue that this provision exempts the Providers from liability for violating the Mandate, which, they assert, purports to require the Providers to violate Title VII by denying them their preferred accommodation.

The plaintiffs' position takes an extremely broad view of Title VII's requirements for employers. Cf. <u>We the Patriots</u>, 17 F.4th at 291-92 (explaining that "Title VII does not require covered entities to provide [whatever] accommodation . . . [p]laintiffs prefer"). But we need not address the merits of this interpretation because, in any event, the Providers do not have

enforcement authority with respect to the Mandate, and they have no power to determine for the State that the Mandate is invalid under Title VII.  Violating the Mandate would thus have exposed them to a risk of immediate license suspension -- an undue hardship that Title VII did not require them to suffer.[22]

The applicability of the undue hardship defense distinguishes this case from those the plaintiffs cite applying § 2000e-7 in the context of alleged racial discrimination -- where Title VII offers no undue hardship defense.  See, e.g., Guardians Ass'n of the N.Y.C. Police Dep't, Inc. v. Civ. Serv. Comm'n, 630 F.2d 79, 104-05 (2d Cir. 1980) (explaining that an employer could not justify an employment policy with a "disparate racial impact" based on the "requirements of state law").  The plaintiffs cite no case holding that Title VII preempted a state law in analogous circumstances involving religion, and, as discussed above, multiple circuits have held that potential penalties under state

---

[22]    The plaintiffs have never argued that there were any steps the Providers could or should have taken to test the Mandate's legal validity under Title VII or to determine whether granting the plaintiffs their requested accommodation would result in enforcement actions by the State, short of defying the Mandate and risking penalties.  We thus need not decide whether taking such steps would have constituted an undue hardship.  Cf., e.g., Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir. 2000) (holding that it would have been an undue hardship to require an employer to seek a waiver from an IRS requirement that employers provide their employees' Social Security numbers to the agency).

law can establish an undue hardship defense.  See Bd. of Educ., 911 F.2d at 890-91; Bhatia, 734 F.2d at 1384.

We conclude that the Title VII claims were properly dismissed.

## III.

For the foregoing reasons, we affirm the dismissal of the plaintiffs' claims under the Supremacy Clause, § 1985, and Title VII.  We also affirm the dismissal of the plaintiffs' claims against Governor Mills and their damages claims against the State. We reverse the dismissal of the remaining claims, and remand for proceedings consistent with this opinion.  All parties shall bear their own costs.