# United States Court of Appeals
## For the First Circuit

No. 24-1063

CAPTAIN ALBERT BROX, KIMBERLY FERNANDES, JAMES BONDAREK, ANDREA
SHEEDY, PAUL MENTON, CHRISTOPHER OVASKA, MARK ANDERSON, TIM
RICHARDSON, STEVEN ENNIS, SONIA SIMONEAU, and JEFFERY D'AMARIO,

Plaintiffs, Appellants,

v.

WOODS HOLE, MARTHA'S VINEYARD AND NANTUCKET STEAMSHIP AUTHORITY,
and JANICE KENNEFICK,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Patrick K. Daubert, with whom Daubert Law, PLLC was on brief,
for appellants.

Ryan W. Jaziri, with whom Keith H. McCown, Jeffrey T. Collins,
and Morgan, Brown & Joy, LLP were on brief, for appellees.

January 9, 2026

HOWARD, **Circuit Judge**. The appellants, eleven current and former employees of the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority (the "Authority"), challenge the denial of their request for preliminary injunctive relief from the Authority's vaccination policy adopted during the COVID-19 pandemic. This is our second encounter with this litigation. After our previous decision remanding the matter to the district court, that court again declined to issue an injunction. We affirm.

## I.

We have previously detailed the facts and procedural history of the case. See Brox v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth., 83 F.4th 87, 89-92 (1st Cir. 2023). The factual record has changed little since then, so we provide a limited recitation of the facts and update the procedural history.

In January 2022, the Authority disseminated a COVID-19 vaccine mandate to its employees "in order to prevent viral infection and transmission." The COVID-19 Vaccination Verification Policy (the "Policy") required all employees to have received or to obtain immediately "at least one COVID-19 vaccination" and to be "fully vaccinated in accordance with the [Centers for Disease Control and Prevention's ("CDC")] definition" within six weeks. The Policy provided an exemption in the event an employee (1) provided documentation from a healthcare provider

that the vaccine was medically contraindicated, if such employee is "able to perform their essential job functions with a reasonable accommodation that is not an undue burden on the Authority"; or (2) "object[ed] to vaccination due to a sincerely held religious belief, provided that any such employee is able to perform their essential job functions with a reasonable accommodation that is not an undue burden on the Authority." Under the Policy, requests for religious exemptions were to be reviewed "by the Authority on a case-by-case basis." Employees without a qualifying exemption who refused to become vaccinated would be subject to discipline, including termination.

Thirteen employees applied for religious exemptions. The Authority's Director of Human Resources, Janice Kennefick, together with the Authority's general counsel and operations staff, reviewed and analyzed the submitted requests. After considering the requests and interviewing the employees, Kennefick sent denial letters to the eleven appellants, containing the following language: "[W]e are unable to approve your request [for religious exemption] due to the direct threat your unvaccinated status would pose to the health and well-being of your fellow employees, our customers and/or vendors." Given that the appellants' jobs required them to regularly interact in enclosed spaces with other employees and customers, the Authority reasoned that "exemptions from the Policy for these individuals would

unreasonably risk their own health and safety as well as the health and safety of fellow employees, customers and/or vendors" and "undermine public trust and confidence in the safety of the Authority's facilities and vessels."  In late January 2022, the appellants were retroactively placed on unpaid suspension for failing to satisfy the vaccination mandate.  In total, Kennefick denied twelve of the thirteen religious exemption requests that she received, granting only that of one fully remote employee.

One employee applied for a medical exemption.  The employee's job duties and responsibilities were "identical" to several of the appellants.  Shortly after the Authority issued the Policy, the employee submitted both a religious exemption request and a medical exemption request.  He provided a note from his healthcare provider recommending that he not receive the COVID-19 vaccine for the next three months, as he had recently contracted COVID-19.  The note from the healthcare provider, in light of CDC recommendations at the time, persuaded the Authority to provide the employee a temporary medical exemption until April 2022.

The employee did not experience similar success with his religious exemption request, however.  After granting his medical exemption, the Authority denied him a permanent religious exemption in a letter identical to those sent to the appellants. When the employee's medical accommodation expired and he refused to become vaccinated, his employment was terminated.

- 4 -

Four appellants later became vaccinated and remained employed at the Authority.[1] The remaining seven refused to receive vaccinations and were eventually fired.

A complaint was originally filed in state court against the Authority and Kennefick in her official capacity. The appellants alleged that the Policy violated their right to free exercise of religion under Article 2 of the Massachusetts Declaration of Rights (Count I) and the First Amendment's Free Exercise Clause (Count II); the Massachusetts Unlawful Discrimination Law, Mass. Gen. Laws ch. 151B, § 4 (Count III); and their Fourteenth Amendment due process rights to privacy, personal autonomy, and personal identity (Count IV). Appellants sought preliminary and permanent injunctive and declaratory relief, including issuance of a temporary restraining order ("TRO"). The TRO was granted in part. The case was then seasonably removed to federal court, where the district court denied the appellant's request for a preliminary injunction. Brox v. Woods Hole, Martha's

---

[1] The four inoculated appellants remain parties to this appeal, as they seek to enjoin any future attempt by the Authority to require additional booster shots. One may question whether, in today's epidemiological environment, the four current employees would still be subject to future boosters. Nevertheless, the existing record as it came to us establishes that the appellants are required to receive booster shots "in accordance with the CDC definition of fully vaccinated and as adopted by the Massachusetts Department of Public Health."

Vineyard & Nantucket S.S. Auth., 590 F. Supp. 3d 359, 364-70 (D. Mass. 2022).

In the first appeal, we affirmed the district court's denial of preliminary injunctive relief as to three of the counts, but we vacated the court's denial as to the appellants' First Amendment claim. Brox, 83 F.4th at 100-02. Having determined that the district court should have assessed the relevance of the one medical exemption that had been granted, as well as addressed what level of scrutiny should be applied to the First Amendment claim, we remanded for further consideration of the request for injunctive relief. Id. at 97-98. In doing so, we noted our then recent decisions in Does 1-6 v. Mills, 16 F.4th 20 (1st Cir. 2021), and Lowe v. Mills, 68 F.4th 706 (1st Cir. 2023), in which we considered Free Exercise challenges to a Maine COVID-19 vaccine mandate. See id. at 100.

On remand, the district court again declined to preliminarily enjoin the Policy. Brox v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth., 706 F. Supp. 3d 151, 153 (D. Mass. 2023). The court first determined that it would apply rational basis review to the Free Exercise claim. The court determined the Policy to be generally applicable, as "the risks of granting [the one employee] a medical exemption are not comparable to those of granting plaintiffs their requested religious exemptions" and therefore, any difference in the treatment of the two types of

- 6 -

exemptions did not affect the Policy's general applicability. In reaching this conclusion, the court leaned on two factors: (1) the length of the accommodations requested (permanent versus three months) and (2) the number of exemptions requested (thirteen for religious accommodations versus only one for medical accommodations). As a result, the district court determined that rational basis was the proper level of scrutiny to apply to the appellants' claim.

Applying rational basis review, the court held that the Policy passed muster because "requiring all employees to be vaccinated, subject to limited exemptions, is rationally related" to the Authority's interests in "[l]imiting COVID-19 infection and transmission." The court also observed that, even if the Policy were subjected to strict scrutiny, the appellants' claims would still likely fail. On this point, the court offered three reasons. First, the court reasoned that "[t]he Authority has a compelling justification: as discussed, granting eleven indefinite religious exemptions creates a substantially higher risk of infection and transmission than granting one time-limited medical exemption." Second, the court determined that the Policy is narrowly tailored to the least restrictive means because the Authority considered other alternatives, such as masking and social distancing, but concluded that those methods were insufficient to further the Authority's interests. Finally, the court added, the Policy is

not overinclusive since it applies only to Authority employees -- who "regularly interact with fellow employees, customers and/or vendors." Nor is it underinclusive, as it also prohibits secular conduct that is comparable to the burdened religious conduct.

Having determined that the appellants were unlikely to succeed on the merits, the district court also concluded that the remaining injunctive relief factors weighed in favor of the Authority and again denied the request for preliminary injunctive relief. This appeal followed.

## II.

We review the district court's denial of a preliminary injunction for abuse of discretion. See Capen v. Campbell, 134 F.4th 660, 668 (1st Cir. 2025). Within this standard, we review questions of law de novo and factual findings for clear error. Mills, 16 F.4th at 29.

In deciding whether to issue a preliminary injunction, a court weighs four factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Charlesbank Equity Fund II, LP v. Blinds to Go, Inc., 370 F.3d

- 8 -

151, 162 (1st Cir. 2004) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). This analysis often turns on the likelihood of success on the merits, for "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Accordingly, we begin our review by assessing whether the record establishes a likelihood that the appellants will succeed on the merits. To do so, we must determine what level of scrutiny likely applies to the appellants' Free Exercise claim and then consider whether the Policy meets that level of scrutiny.

"The First Amendment's Free Exercise Clause, as incorporated against the states by the Fourteenth Amendment, protects religious liberty against government interference." Mills, 16 F.4th at 29. However, not every law that "incidentally burdens free exercise rights" is subject to strict scrutiny. Id. The standard of scrutiny that governs judicial review hinges on whether the government action at issue is "religiously neutral and generally applicable." Id. When a law is neutral with respect to religion and generally applicable, the law need only be "rationally related to a legitimate governmental interest." Id. (citing Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021)). Conversely, if a law is not neutral or generally applicable, then it is

subjected to strict scrutiny and must be "justified by a compelling state interest and . . . narrowly tailored in pursuit of that interest." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 (2022).

The parties agree that the Policy is neutral with respect to religion. Simply put, the Policy does not discriminate against religious practices or beliefs on the basis of their religious nature. See Fulton, 593 U.S. at 533. The battleground of this appeal instead involves the question of the Policy's general applicability. The Supreme Court has identified two circumstances in which a law is not generally applicable: (1) when it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'"; or (2) "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Id. at 533-34 (alteration in original) (quoting Emp. Div., Dep't of Hum. Res. v. Smith, 494 U.S. 872, 884 (1990)).

The appellants contend that both of these circumstances are present here. First, they argue that the Policy "invited Kennefick to consider the particular reasons for appellants' religious exemption requests through an individualized exemption process." Second, according to the appellants, the Policy permitted secular conduct that undermined the Authority's asserted

- 10 -

interests in ways that were similar to how those interests would have been undermined by allowing religious exemptions. We address each argument in turn.

**A.**

The appellants' individualized exemption argument was not properly preserved for appeal. Relying on an affidavit that Kennefick provided to the district court, the appellants assert to us that Kennefick and "a small cadre of Authority" officials retained "sole discretion" to "decide which reasons for not complying with the vaccine mandate are worthy of solicitude." In the appellants' view, this purported discretion to grant or deny requests on a case-by-case basis renders the Policy not generally applicable, triggering strict scrutiny. The district court found that this ground was waived, and we see no reason to disturb that judgment on appeal.

"[T]heories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal." Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006). Here, the appellants did not raise this ground when they first moved for a preliminary injunction in 2022 nor when they renewed their request after remand in October 2023. Instead, the argument first appeared in the district court in the appellants' reply brief on their renewed motion, and the court reasonably concluded that the argument was waived. See Noonan v. Wonderland Greyhound Park

- 11 -

Realty LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) (finding new argument raised in reply memorandum was waived because "[t]he purpose a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum"); Aiello v. Signature Com. Sols., LLC, No. 23-cv-11930, 2025 WL 1424621, at *2 (D. Mass. May 16, 2025) ("As a general matter, arguments left out of a moving party's opening brief are deemed waived."); Napert v. Gov. Emp. Ins., No. 13-cv-10530, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013) ("Where, as here, a moving party raises an argument for the first time in a reply brief, that argument is waived."). The appellant's argument, untimely raised below, was therefore not properly preserved for appeal. Cf. United States ex rel. Lovell v. AthenaHealth, Inc., 56 F.4th 152, 156, 161 (1st Cir. 2022) (declining to consider on appeal argument that the district court had found was waived because of the party's failure to squarely brief).

The appellants nevertheless insist that they have otherwise previously asserted that the Policy created a formal mechanism for granting exemptions through an individualized exemption process. As support, they point to a handful of sentences in a previous reply brief in the district court[2] in

---

[2] The appellants also refer to a few sentences from briefing to this court in their prior appeal that either reiterated the principle that individualized exemptions are not generally

- 12 -

connection with the appellants' initial motion for preliminary injunction in February 2022, in which they cited Ward v. Polite, 667 F.3d 727, 733 (6th Cir. 2012), for the proposition that the Authority's facially neutral policy becomes discriminatory against religion if the policy is wrought with only secular individualized exemptions.  A few vague statements in a prior reply brief without any further analysis are insufficient to establish that the appellants' individualized exemption argument was "squarely and timely raised" before the district court.[3]  See Iverson, 452 F.3d

applicable or simply stated that "a public employer [may not] discretionarily exempt secular objectors for limited periods while denying the same to religious objectors."  These statements were of course not before the district court and thus not properly raised there.  Even if they had been, the appellants' prior arguments on appeal do not parallel their current formulation. Explaining in the prior appeal that "the appellants at times appear to be arguing that such demanding scrutiny applies because the Policy is 'wrought with only secular individualized exemptions,'" we concluded "that characterization of the Policy appears to be wrong, given that a medical exemption is the only non-religious exemption that the Policy permits . . . and, we note, the appellants develop no contrary argument." Brox, 83 F.4th at 96-97 (citations omitted).  It is only now that the appellants have refashioned this argument to challenge the discretion granted to the Authority in reviewing religious exemptions.

[3] The appellants' suggestion that their delay in raising the issue of a discretionary individualized exemption is justified because that argument only "crystalized upon a careful reading of the Background section to the Authority's most recent Opposition" is similarly unpersuasive.  The evidence on which appellants now base their claim has been in the appellants' arsenal since well before the parties' most recent preliminary injunction skirmish. For example, Kennefick's affidavit -- in which she recounts the Authority's process for reviewing the appellants' religious exemption requests -- was originally filed with the district court in early 2022.  Similarly, the language of the policy itself has

- 13 -

at 102; Mancini v. City of Providence ex rel. Lombardi, 909 F.3d 32, 47 (1st Cir. 2018) (finding that two sentences that "cryptic[ally]" and "oblique[ly]" reference a new claim in briefing to the district court were insufficient to preserve the issue for appeal); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) (holding that a claim was waived since the plaintiffs had presented only a "passing mention of the general point -- a mention which, in its entirety, comprise[d] two sentences and one citation (to a tangentially relevant case)"). We decline to consider the waived issue.

## B.

The appellants also assert that the Policy is not generally applicable "because it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way."[4]  "[W]hether two activities

---

always stated that religious exemption requests would be reviewed on a case-by-case basis.

[4] The parties do not address what standard of review applies to the question of comparability in this case.  Given that the appellants' claim would fail under any standard of review, we assume -- to their benefit -- that our review is de novo.  Cf. United States v. Mejía Romero, 822 F. App'x 1, 3 n.1 (1st Cir. 2020) (noting that while parties dispute the applicable standard of review, "[b]ecause we conclude that the claim fails under any standard of review, we assume for argument's sake that our review is de novo"); Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. of P.R. (In re Fin. Oversight & Mgmt. Bd. of P.R.), 987 F.3d 173, 187 (1st Cir. 2021) ("The parties offer no argument concerning the standard of review we should apply to [the appellant's claim of error].  We will assume, arguendo, that de novo review applies."); United

- 14 -

are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." Tandon v. Newsom, 593 U.S. 61, 62 (2021) (per curiam) (citing Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 17 (2020) (per curiam)). We start by determining what the Authority's asserted interests were in enacting the Policy and then consider whether the medical and religious exemptions undermine those interests in similar ways. See Spivack v. City of Philadelphia, 109 F.4th 158, 175 (3d Cir. 2024) ("[W]e must determine (1) what the government's asserted interests are, and (2) whether the medical exemption undermines those interests like a religious exemption would."); We the Patriots U.S., Inc. v. Conn. Off. of Early Childhood Dev., 76 F.4th 130, 151 (2d Cir. 2023) ("[W]e must first determine what interest Connecticut has asserted justifies the [vaccinate mandate], then decide whether permitting medical exemptions and repealing religious exemptions promote the State's interest.").

## 1.

At the first step, the parties present competing characterizations of the Authority's interests. The appellants take the narrow view that the Authority has but a "strict and

States v. Alegria, 192 F.3d 179, 191 (1st Cir. 1999) (explaining bifurcated standard of review that applies to sentencing determinations but "assum[ing] here, favorably to the appellant, that the de novo standard of review obtains").

definitive interest in <u>prevent</u>-ing transmission and infection" of COVID-19. The Authority argues that its interests extend further: "to prevent viral infection and transmission in order to protect the health and safety of the Authority's employees and customers."

At the core of the parties' dispute is a quarrel over semantics. Both the district court and the Authority described the Authority's interests as including "[l]imiting COVID-19 infection and transmission." The appellants insist that this statement grossly mischaracterizes the Authority's own expression of its interests in light of the Policy's written introduction, which states that employees are required to show proof of vaccination "in order to prevent viral infection and transmission." Applying dictionary definitions for "prevent," "limit," and "acquired immunity," the appellants argue that the Policy's purpose was "to prevent, halt, and entirely inhibit viral infection and transmission" of COVID-19. According to the appellants, any means that would allow "some contagion to slip through" cannot further the Authority's asserted interests.

Such a narrow construction of "prevent" in the context of this appeal is unsupported by dictionary definitions, the record, and common sense. As relevant here, the Policy states:

> Further to the Governor's Executive Order No. 595 and [the Occupational Safety and Health Administration's emergency temporary standard] concerning mandatory COVID-19 vaccination requirements for employers, the

> Authority requires all of its employees to provide documentation that they have received COVID-19 vaccination in order to prevent viral infection and transmission . . . .

The appellants' focus on the use of the word "prevent" as opposed to "limit" or "reduce" is too narrow. While "prevent" may in some circumstances mean to "make impossible," it also can refer to "hinder[ing] the progress" of something. Webster's Third New International Dictionary of English Language 1789 (3d ed. 1961) (1993 prtg.) (defining "prevent" as "3: to deprive of power or hope of acting, operating, or succeeding in a purpose; 4: to keep from happening or existing especially by precautionary measures: hinder the progress, appearance, or fulfillment of: make impossible through advance provisions" (emphasis added)); id. at 1070 (defining "hinder" as "2: to make slow or difficult the course of; 3: to keep from occurring, starting, or continuing"). Furthermore, a course of action is "preventive" if it "mak[es] or aim[s] to make unlikely or impossible." Id. at 1798 (emphasis added). Based on these definitions, we understand the ordinary meaning of "prevent" to encompass methods that "hinder the progress" of or aim to "make unlikely" infection or transmission.[5]

---

[5] Nevertheless, even if we were to assume that by "prevent" the Authority meant "100% preclusion of viral infection and transmission," it was not unreasonable for the Authority to use methods that merely "reduce" the spread of COVID-19 in order to promote its interests. It is therefore unsurprising that courts have found that COVID-19 vaccinate mandates are likely to survive

- 17 -

We also agree with other circuits that the interests most emphasized by the Authority both throughout the litigation and in the historical record are relevant to determining what its asserted interests are. See Conn. Off. of Early Childhood Dev., 76 F.4th at 152 ("We conclude from the consistency of defendants' assertions [throughout the legislative process, before the district court, and on appeal] that there is no cause to fear that [the defendants have] 'restat[ed] the State's interest . . . at an artificially high level of generality' to sidestep the general applicability requirement." (alterations in original) (quoting Does 1-6 v. Mills, 142 S. Ct. 17, 20 (2021) (Gorsuch, J., dissenting))); Doe v. San Diego Unified Sch. Dis., 19 F.4th 1173, 1178 n.5 (9th Cir. 2021) (rejecting "narrower formulation" of school district's asserted interest in favor of the broader interest the school district "emphasize[d] most frequently in the record"); Spivack, 109 F.4th at 175 (reasoning that the Supreme Court's emphasis in Tandon on "'the asserted government interest

Free Exercise challenges even when the government's stated purpose was to "prevent" the spread of disease. See, e.g., Hochul, 17 F.4th at 290 (finding, at the preliminary injunction stage, that plaintiffs were unlikely to succeed in their Free Exercise challenge against COVID-19 vaccine mandate where statutory purpose include "prevent[ing] the spread of COVID-19," id. at 285); Doe v. San Diego Unified Sch. Dist., 19 F.4th 1173, 1181 (9th Cir. 2021) ("The record indicates that [COVID-19] vaccines are safe and effective at preventing the spread of COVID-19, and that [the school district's] vaccination mandate is therefore likely to promote the health and safety of [the school district's] students and staff, as well as the broader community.").

- 18 -

indicates that we give some deference to how the government characterizes its own interests" when supported by the record (citation omitted) (quoting Tandon, 593 U.S. at 62)). Here, the consistency with which the Authority has characterized its interests suggests that measures taken by the Authority to "limit" or "reduce" viral infection and transmission or aimed at ensuring the safety of its employees and customers would be in furtherance of its asserted interest. From its first opposition brief to the district court to its most recent filing with this court, the Authority has repeatedly portrayed its interests in enacting the Policy to include "curbing" and "limiting" the spread of COVID-19 to "create a safer and healthier" workplace for its employees and customers. Moreover, the record is replete with examples of the Authority's consistent characterization of its interests, bolstering the conclusion that these asserted interests are not merely post-hoc rationalizations. For example, the rejection letters that Kennefick sent to the appellants directly referenced the Authority's interests in protecting the "health and well-being" of its employees, customers, and vendors. Additionally, the Policy itself outlines the backdrop against which the Authority issued the mandate. The Policy explains the Authority's obligation as a "public employer" to "implement methods of reducing work related injuries and illness." (Emphasis added). Furthermore, the record is clear that the Policy was

influenced by and modeled after Massachusetts's Executive Order No. 595, a vaccine mandate for state executive department employees that sought to "to ensure the health and safety of all Massachusetts workers and residents."

As there is no evidence in the record to suggest the Authority's claimed interests are pretextual, we assume for the purposes of our Free Exercise analysis that the Authority has asserted interests in "prevent[ing] [i.e., curbing, limiting, or hindering] viral infection and transmission in order to protect the health and safety of the Authority's employees and customers."[6] See Hochul, 17 F.4th at 285 (relying on interests asserted by the state in adoption of its vaccine mandate as "[p]laintiffs do not point to any evidence suggesting that the interests asserted are pretextual or should otherwise be disregarded in the comparability analysis").

**2.**

With the Authority's asserted interests in mind, we take up the question of whether the Policy's medical and religious exemptions undermine those interests in similar ways so as to

---

[6] While the Authority had argued below that it had an interest in protecting the health and safety of its employees and customers, the district court did not address this interest and focused solely on the Authority's interest in "preventing infection and transmission." Nevertheless, "we may affirm the District Court on an independent ground if that ground is manifest in the record," as it is here. Brox, 83 F.4th at 98.

- 20 -

render the Policy not generally applicable. To determine whether the two are comparable for purposes of the Free Exercise Clause, we must evaluate the "risks [the] various activities pose." Tandon, 593 U.S. at 62. The question is not whether the risks associated with one individual who for religious reasons is unvaccinated are comparable to those associated with an individual who remains unvaccinated due to health concerns. See Lowe, 68 F.4th at 716. Rather, the Supreme Court instructs that we consider and compare the risks presented by groups of different sizes in different settings. See, e.g., Tandon, 593 U.S. at 63-64 (comparing risks associated with "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants" that were permitted "to bring together more than three households at a time" with that of at-home worshippers); Roman Cath. Diocese, 592 U.S. at 17 (comparing commercial store that was permitted to "have hundreds of people shopping there on any given day" with house of worship "prohibited from allowing more than 10 or 25 people for a worship service"); see also Hochul, 17 F.4th at 287 (explaining that Supreme Court cases "compar[ing] the risks posed by groups of various sizes in various settings[] suggests the appropriateness of considering aggregate data about transmission risks"). We therefore consider the "aggregate data about transmission risks," that is, we review the number of exempted individuals as well as

their locations and the durations of the exemptions in order to assess how the risks posed by granting each exemption compare. Lowe, 68 F.4th at 716 (quoting Hochul, 17 F.4th at 287). After all, it is doubtful "as an epidemiological matter, [that] the number of people seeking exemptions is somehow excluded from the factors that the State must take into account in assessing the relative risks to the health of [employees] and the efficacy of its vaccination strategy." Id. For the reasons discussed below, we hold that the district court did not err in finding that the two exemptions were not comparable for Free Exercise purposes.

First, unlike the religious exemption, the medical exemption furthers the Authority's asserted interest in protecting the health and safety of its employees and customers. Our prior decision in Does 1-6 v. Mills is instructive. Mills involved a Free Exercise challenge to a Maine law that required certain licensed healthcare facilities to implement a COVID-19 vaccine mandate for non-remote workers. 16 F.4th at 24, 28. On appeal, we affirmed the district court's denial of a preliminary injunction. Id. at 24. In assessing the "likelihood of success" factor, we noted that Maine had articulated three interests in promulgating the mandate, including "protecting the health and

safety of all Mainers."[7] Id. at 31. We held that including a medical exemption did not undermine any of Maine's interests since "providing healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their own health and their ability to provide care." Id. Conversely, a religious exemption would not advance any of Maine's public health-related interests. Id. As a result, "the comparability concerns [that] the Supreme Court flagged in the Tandon line of cases" were not present in Mills. Id. at 32.

We see no reason to come to an opposite conclusion in the posture of this appeal. Unlike the Policy's religious exemption, the medical exemption is available to only those employees who can demonstrate that they have medical contraindications to the COVID-19 vaccination -- a fact that furthers the Authority's interest in protecting the health of its employees. As in Mills, granting a religious accommodation does not further the Authority's health and safety interests nor decrease the risks of viral infection or transmission.[8] See 16

_____

[7] The remaining two interests were tailored to healthcare workers: "ensuring that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system" and "protecting the health of . . . those in the state most vulnerable to the virus -- including those who are vulnerable to it because they cannot be vaccinated for medical reasons." Mills, 16 F.4th at 30-31.

[8] The appellants concede that Mills, in reviewing a denial of preliminary injunction, is the "procedural cognate [of our recent

- 23 -

F.4th at 31 ("[C]arving out an exception for those people to whom that physical health risk applies furthers Maine's asserted interests in a way that carving out an exemption for religious objectors would not."). This juxtaposition suggests that the exemptions are not comparable. See, e.g., Doe, 19 F.4th at 1178 ("Limitation of the medical exemption [to students with contraindications to the COVID-19 vaccination] . . . serves the primary interest for imposing the mandate -- protecting student 'health and safety' -- and so does not undermine [the school district's] interests as a religious exemption would."); Spivack, 109 F.4th at 176 ("Unlike a religious exemption, a medical exemption furthers the [agency's] interest in keeping its employees safe and healthy by allowing employees for whom the COVID-19 vaccine would cause death or illness to abstain from vaccination."); Conn. Off. of Early Childhood Dev., 76 F.4th at 153 (concluding medical and religious exceptions are not comparable as medical exemption to vaccine "promotes the health

_____

vaccine mandate cases] to this appeal" but raise several arguments in attempts to distinguish its outcome. They contend that, given variable evidence of vaccine efficacy, "the COVID-19 vaccines did not and could never further the Authority's goal of preventing viral infection and transmission," and even assuming arguendo that they do, "the Authority's goal of transmission prevention was accomplished upon its reaching a 90% vaccinated workforce" based on the Maine's vaccination rubric discussed in Mills. The appellants do not advance any explanation why the 90% vaccination goal suggested by the State of Maine has any bearing on the Authority's interests as to its own workforce.

and safety of unvaccinated students" as it does not force those students "who cannot be vaccinated for medical reasons to avoid the harms" from taking the vaccine).

Second, not only does the medical exemption further the Authority's asserted interests while the religious exemption does not, but also the risks associated with each exemption are not comparable to one another. We have previously observed that "medical exemptions are likely to be rarer, more time limited, or more geographically diffuse than religious exemptions, such that the two exemptions would not have comparable public health effects." Lowe, 68 F.4th at 715; see also Doe, 19 F.4th at 1178 (noting medical and religious exemptions would not be comparable if more students were likely to seek religious exemptions than medical and medical exemptions were more likely to be "limited in duration" (quoting Hochul, 17 F.4th at 286)). Based on the limited record before us, this appears to be the case here as well. Within a month of disseminating the Policy to its employees, the Authority received thirteen religious exemption requests and only one medical exemption request. All of the religious exemption requests that were submitted sought permanent accommodations, as opposed to the one medical exemption seeking a three-month exemption. The nature of the Authority's business often requires employees to interact with each other and with customers in close quarters for

extended periods of time.[9] It is thus understandable that, while "'it may be feasible for [the Authority] to manage the COVID 19 risks posed by a small set of objectively defined and largely time-limited medical exemptions,' 'it could pose a significant barrier to effective disease prevention to permit a much greater number of permanent religious exemptions.'" Doe, 19 F.4th at 1178 (quoting Hochul, 17 F.4th at 286). We conclude based on the evidence before us that the medical and religious exemptions here are thus not comparable for purposes of the Free Exercise Cause, and the Policy is generally applicable.[10] See, e.g., Conn. Off.

---

[9] There was evidence before the district court that, given the design of the Authority's vessels, there is often limited space "mak[ing] regular social distancing impractical and/or impossible." This issue is exacerbated by the fact that "vessel crews typically berth over night [sic] onboard the vessel," where sometimes "vessel crew quarters are designed for multiple occupancy at a time." The close quarters of vessels were unsurprisingly problematic during the height of the pandemic as the Authority -- based on CDC guidance -- would "send unvaccinated employees who were in close contact with those who tested positive home, until they obtain a negative polymerase chain reaction ("PCR") test and/or quarantine for the required time period." The unvaccinated employee's duties would then need to be filled by another employee.

[10] The appellants argue that "if granting appellants their exemption requests represented an eleven-fold (1,100%) increase, then granting [one employee's] time-limited medical exemption represented a one-fold (100%) increase in the chances of spreading COVID-19," thus increasing the risk of COVID-19 to an "unacceptable degree." The district court was correct to reject this argument. Notably, the appellants' math does not account for the difference in length of the requested exemptions and how the significantly shorter medical exemption affects the comparable risks. Furthermore, agreeing with the appellants' theory would mean that in any case where at least one medical exemption was requested and

- 26 -

of Early Childhood Dev., 76 F.4th at 153 (concluding that "exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the State's interest [in student health and safety]"); Spivack, 109 F.4th at 176 (recognizing, as a "common-sense distinction," that a medical exemption furthers the agency's interest in promoting the health and safety of the employees while a religious exemption does not).

## C.

Because the Policy is both neutral and generally applicable, the appropriate standard of review is rational basis. See Fulton, 593 U.S. at 533. The Policy need only be "rationally related to a legitimate governmental interest," Mills, 16 F.4th at 29, a standard it satisfies.

At the time that it enacted the Policy, the Authority undoubtably had legitimate interests in preventing the spread of COVID-19 and in protecting the health and safety of its employees, customers, and vendors. See Roman Cath. Diocese, 592 U.S. at 18 ("Stemming the spread of COVID-19 is unquestionably a compelling

---

granted -- regardless of the number of religious exemptions requested -- granting the medical exemption would "increase[] the changes of spreading COVID-19 to an unacceptable degree." This runs of afoul of Supreme Court precedent suggesting that we must consider the aggregate risk of transmission. See Lowe, 68 F.4th at 716.

interest . . . ."); <u>Mills</u>, 16 F.4th at 32 ("Few interests are more compelling than protecting public health against a deadly virus."); <u>Norris</u> v. <u>Stanley</u>, 73 F.4th 431, 436 (6th Cir. 2023) ("Public health and safety easily fall within the state's legitimate interests."). Requiring vaccination for all employees, while also providing a limited exemption to those for whom the vaccine is medically contradicted, was also rationally related to achieving the Authority's interests. See <u>Mills</u>, 16 F.4th at 32 (concluding rational basis review of vaccine mandate is likely met since policy "serve[s] the state's goal of protecting public health"); <u>Hochul</u>, 17 F.4th at 290 (finding COVID-19 vaccination mandate, subject to a medical exemption, satisfies rational basis review as it was a "reasonable exercise" of power "to protect the public health").

The appellants' argument resisting this conclusion is again consistent with the general theme of their entire appeal: Given that the data about transmission risks shows that the vaccines are not 100% effective in stopping viral infection, there is no rational relationship between implementing the vaccination mandate and the Authority's "lone asserted aim" of contagion prevention. As evidence, the appellants cite to a 2022 CDC fact sheet that was provided to the district court as the Authority's scientific basis for issuing the Policy. That fact sheet explains

that breakthrough infections can be expected among people who are vaccinated.

In the appellants' prior appeal, we determined that this fact sheet, even with its mention of breakthrough infections, was nevertheless sufficient to establish that the Policy had a rational basis for purposes of the appellants' Fourteenth Amendment privacy claim. Brox, 83 F.4th at 101. The same result is required here. The February 2, 2022, fact sheet, titled "What You Need to Know About Variants", explains that "[b]reakthrough infections [of COVID-19 variants] in people who are vaccinated are expected, but being up to date on recommended vaccines is effective at preventing severe illness, hospitalizations, and death." It goes on to explain that "[p]eople who are up to date on vaccines, including booster doses when eligible are likely to have stronger protection against COVID-19 variants." As we have already rejected above the appellants' cabined view of what it means to "prevent" infection, we cannot accept their argument that any possibility of breakthrough infections renders the Authority's implementation of the Policy irrational. Even setting aside the Authority's interest in disease prevention, means that "prevent[] severe illness, hospitalizations, and death" are rationally related to the Authority's broader health and safety interests. And as we have previously explained, "regardless of whether the statements in this document are in fact true, they are more than sufficient to

show the Authority had a 'plausible justification' for adopting the Policy, which is all that is required to satisfy rational basis review." Id. (quoting Waithe ex rel. A.C. v. McKee, 23 F.4th 37, 46 (1st Cir. 2022)).

We underscore that the focus of the inquiry is into the reasonableness and plausibility of the Authority's decision-making in issuing the Policy. As such, concerns that the appellants raised in the district court about a 2023 CDC webpage (that is not alleged to be the basis of the Authority's reasoning in implementing the Policy) cited in the background section of the district court's order are not relevant. The appellants argue that the district court abused its discretion by taking judicial notice of a 2023 CDC webpage for the proposition that the COVID-19 vaccines "are effective." The webpage, titled COVID-19 Vaccine Effectiveness Update, is only referenced in the background section of the court's order on the appellants' renewed preliminary injunction motion. We are hard-pressed to find that the 2023 CDC webpage had any influence on the district court's holding. The court's analysis supporting its conclusion that the Policy was generally applicable and survived rational basis review made no reference to the webpage with which the appellants take issue. At most, the district court made an ambiguous reference to "publicly available data" when it stated that "[t]o the extent that plaintiffs mean to argue that the Authority cannot have acted

pursuant to a legitimate or compelling interest because the Vaccines are not effective, this is belied by publicly available data." The district court notably did not then cite to the 2023 CDC webpage, nor did it include any citation at all. There thus is no reason for us to conclude that the district court rejected the appellants' argument solely, or even predominately, on the basis of the CDC website. In fact, the district court said as much in explaining that "[a]t any rate, the argument" that the Authority did not act pursuant to legitimate interests because the vaccines are not effective "is too underdeveloped to merit further consideration." That conclusion was sound.

### III.

Having not persuaded us that the Policy fails rational basis review, the appellants have not established that they are likely to succeed on the merits, and we need not address the remaining preliminary injunction factors. Pharma. Rsch. & Mfrs. of Am. v. Concannon, 249 F.3d 66, 84-85 (1st Cir. 2001), aff'd, 538 U.S. 644 (2003); Weaver v. Henderson, 984 F.2d 11, 14 n.5 (1st Cir. 1993).

### IV.

The district court's order denying the appellants' renewed request for a preliminary injunction is affirmed.